**David L. GOODMAN et al.,
Plaintiffs-Appellants,**

**v.**

**Sidney EPSTEIN et al.,
Defendants-Appellees.**

**No. 77–1209.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 23, 1977.

Decided July 18, 1978.

As Amended July 21, 1978.

As Modified on Denial of Rehearing and
Rehearing En Banc Sept. 25, 1978.

Edward L. Foote, Chicago, Ill., for plaintiffs-appellants.

Paul E. Freehling, Chicago, Ill., for defendants-appellees.

Before TONE, Circuit Judge, KUNZIG, Judge,* and BAUER, Circuit Judge.

KUNZIG, Judge.

This action seeking compensation for damages suffered as a result of a limited partnership land development scheme gone awry comes to us on plaintiffs' appeal from a judgment entered on a general jury verdict for defendants in the United States District Court for the Northern District of Illinois, Eastern Division.

---

* Judge Robert L. Kunzig of the United States Court of Claims is sitting by designation.

Plaintiffs (David L. Goodman, Mollie E. Goodman, Lee A. Freeman, and Lee A. Freeman, Jr., hereinafter plaintiffs or the investors), certain holders of limited partnership interests[1] in the D-E Westmont Limited Partnership, filed their complaint against the defendants (Sidney Epstein, Raymond Epstein, and Melvin M. Kupperman, hereinafter defendants or developers), the general partners of D-E Westmont, on February 23, 1976. Their complaint charged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976)[2] and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5 (1977)[3] (Count I), common law fraud (Count II), and breach of fiduciary obligations stemming from alleged misrepresentations made by the general partners in calling for funds under the terms of the limited partnership agreement (Count III). Plaintiffs sought damages in the amount of their total investments, $1,061,500.[4]

Defendants counterclaimed on the basis of a purported release executed by both Freemans, seeking a declaratory judgment that the release was valid and damages arising from their defense to plaintiffs' action. After a trial that lasted approximately six weeks and which consumed some 4,000 pages of transcript, the jury returned a general verdict against all plaintiffs and in favor of all defendants on each of the three counts.[5]

From this general jury verdict, plaintiffs now appeal to this court, which assumes jurisdiction pursuant to 28 U.S.C. § 1291 (1970), raising seven specific errors on the part of the trial judge (four in his instructions, and three in his conduct of the trial), and arguing that any one of the seven could have so prejudiced the proceedings in favor of the defendants that a new trial would be mandated. Defendants reply, essentially, that the trial judge's interpretation of the law was correct, that his conduct of the trial was fair, and that, if plaintiffs could find only these seven points with which to take exception in this complex securities fraud litigation which consumed some thirty trial days, then the fairness of the entire proceedings is manifest and the determina-

---

1. Plaintiffs Lee A. Freeman and Lee A. Freeman, Jr., were named as limited partners in the amended D-E Westmont limited partnership agreement. Plaintiffs David L. and Mollie E. Goodman, were assignees of a part of the interest of a third person, Jerry B. Poncher, named as a limited partner in that same amended agreement. All these individuals will hereinafter be referred to as limited partners.

2. Section 10 of the Securities Exchange Act of 1934 reads in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
* * * * * *
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b) (1976).

3. The ubiquitous Rule 10b–5, entitled "Employment of manipulative and deceptive devices," reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interestate [sic] commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5 (1977).

4. This $1,061,500 figure represented 50 percent of the total investments made by all the limited partners of D-E Westmont, both those who are plaintiffs and those who elected not to sue.

5. When plaintiffs requested a directed verdict on the counterclaim, defendants requested the trial court to dismiss the counterclaim, which it did.

tion of the jury should be affirmed. Although, for the stated reasons following in this opinion, it appears that six of the seven alleged errors now asserted by the plaintiffs would be insufficient to necessitate a reversal, we believe that one of the trial judge's instructions could have seriously misled the members of the jury concerning the law with respect to time of purchase of securities. Since this error alone could have resulted in the jury's verdict in favor of the defendants on Count I, we reverse on that Count and mandate a new trial on that Count alone.

## HISTORY OF THE CASE

The series of events giving rise to the dispute commenced in the summer of 1971, when L. W. Douglas, Jr., an experienced real estate developer, contacted the defendants, who are architects, engineers, and developers, and proposed that they purchase a certain piece of Westmont, Illinois property and develop it into a residential complex. In October of 1971, Lee A. Freeman (Freeman), an experienced investor in real estate who had worked with Douglas on previous projects, informed both Douglas and defendant Sidney Epstein that he wanted a substantial equity interest in the proposed development. Prior to the end of 1971, Freeman, his son and law partner, Lee A. Freeman, Jr. (Freeman, Jr.), and their sometimes client, Jerry E. Poncher (Poncher), contributed an aggregate of $245,955 which was used to prepay the interest on the real estate loan for the Westmont ven-

ture.[6] It was not until June of 1972, however, that this amorphous business venture was formalized into a limited partnership.

In the interim, Freeman was apparently a moving force in setting up the financing for the entire deal, tentatively agreeing, in late 1971, to take or place at least 60 percent of the equity, with Poncher agreeing to take the remaining 40 percent.[7] Freeman even went so far as to negotiate many of the terms of the limited partnership agreement with Douglas. However, when the D-E Westmont Limited Partnership Agreement (with the first amendment thereto) was signed in late June of 1972, Freeman, Freeman, Jr., Poncher, and five other individuals signed only as limited partners, agreeing to furnish total capital of $3 million.[8] The general partners, entrusted with the management authority to develop the 108 acres of vacant land, were the Epsteins, Kupperman, and Douglas.

Shortly after this limited partnership agreement and its accompanying first amendment were executed, a certificate of limited partnership was signed and filed as required by Illinois state law. The parties agree that the provisions of the certificate substantially reflect those of the partnership agreement as amended. However, the investors go further and correctly emphasize the legal implications of a limited partnership agreement undertaken in compliance with the Illinois statutes on limited partnerships:

Under the statute, limited partners have no right to participate in the manage-

---

6. The tax benefits to an individual with substantial income of such a prepayment of interest are self-evident. Defendants contended that tax savings was the main purpose of the limited partners in entering the Westmont venture, and there was some evidence in the record from which the jury could have found that to be a substantial consideration of at least the Freemans and Poncher.

7. Further, defendants assert that Freeman, in March of 1972, insisted that he alone would decide who the limited partners were to be in the yet-to-be-formed limited partnership. There is some evidence in the record to support this assertion.

8. Under certain circumstances, the limited partners could be called upon to increase their total contributions beyond the $3 million. Although defendants contend, and Sidney Epstein apparently believed, that the initial $3 million contribution was due upon the signing of the agreement, the agreement itself (and its amendment) called for contributions of the capital by the limited partners "from time to time, upon the request of the General Partners." (Amendment to D-E Westmont Limited Partnership Agreement, para. 2) While the General partners could conceivably have "requested" a lump sum payment "up front," it appears from the wording of the document as though the signatories contemplated a number of separate transactions over an extended period of time.

ment of the enterprise. If they do assume such a role, they lose the protection of limited liability. The partnership agreement itself states that "[n]o Limited Partner will take part in the management of the partnership business or transact any business for the partnership or have any power to sign or bind the partnership or to subject the partnership to any liability or obligation." (citations omitted)[9]

Brief for plaintiffs at 13–14.

The purpose of this limited partnership was expressed in the agreement itself as "the residential development" of the Westmont land and the evidence demonstrates that a substantial apartment complex was planned, consisting of both townhomes and highrise apartments. Some beginning steps had been taken towards accomplishment of this purpose prior to the formalization of the business relationship. In February of 1972, for example, an effort spearheaded by defendant Kupperman resulting in a rezoning of the property to provide greater flexibility in development; the developers also began, in early 1972, the process which eventually resulted in a direct access road to the property from a nearby highway. Therefore, at the time of the signing of the agreement, it appears that the development of the property was proceeding apace.

In early July of 1972, soon after the limited partnership was formalized, the Goodmans became limited partners in the venture by purchasing 25 percent of Poncher's 40 percent equity interest.[10] Within six weeks of the signing of the agreement, negotiations began with Larwin Multi-Family Housing Corporation (a subsidiary of CNA, a large insurance company) concerning the possibility of Larwin's purchasing the Westmont venture from the partnership. These negotiations eventually culminated in an offer from Larwin. The developers now assert that an immediate sale to the Larwin interests would have provided the investors with a huge, short-term profit, but that the investors were more interested in tax loss than in cash profits and, so, were "unenthusiastic" about selling. The investors, however, claim that only the developers had detailed, inside knowledge of the Larwin negotiations and that only the developers could, therefore, have been responsible for, or could have had reasonable expectation of, the final collapse of the Larwin deal in December of 1972.

During the pendency of the Larwin negotiations, development was not at a standstill. After the signing of the limited partnership agreement, the developers moved to secure the necessary permits from local authorities to allow installation of sewerage facilities for the planned residential complex. The exact progress of this application

9. The applicable sections of the Illinois limited partnership statutes read, in pertinent part:
　§ 47. Contributions
　　The contributions of a limited partner may be cash or other property, but not services.
Ill.Ann.Stat. ch. 106½ § 47 (Smith Hurd)
　§ 50. Limitation of liability
　　A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business.
Ill.Ann.Stat. ch. 106½ § 50 (Smith Hurd)
　§ 53. Rights of limited partners
　　(1) A limited partner shall have the same rights as a general partner to
　　(a) Have the partnership books kept at the principal place of business of the partnership, and at all times to inspect and copy any of them
　　(b) Have on demand true and full information of all things affecting the partnership,

and a formal account of partnership affairs whenever circumstances render it just and reasonable, and
　　(c) Have dissolution and winding up by decree of court.
　　(2) A limited partner shall have the right to receive a share of the profits or other compensation by way of income, and to the return of his contribution as provided in Sections 15 and 16.
Ill.Ann.Stat. ch. 106½ § 53 (Smith Hurd)

10. Paragraph 17 of the limited partnership agreement provides for transfer of a Limited Partner's interest, and states that "[t]he transferee shall be a Limited Partner to the extent of the partnership interest transferred or encumbered." For the purposes of this opinion, we shall assume without deciding that the Goodmans do, in fact, hold limited partnership status.

was the subject of some dispute between the parties. Plaintiffs asserted at oral argument that significant problems (as evidenced by an Epstein organization internal memorandum) developed as early as September 14, 1972. Defendants, on the other hand, argued that the first hint of any difficulties occurred in January of 1973, when the Illinois Environmental Protection Agency (IEPA), formally denied the developers' application for a permit, and that, even then, they were being assured by the local governmental entity that any minor misunderstandings with the IEPA could certainly be worked out. Regardless of the actual beginning date of the difficulties, however, the significant fact alleged by the investors is that they were given no notice of the difficulties being incurred in this regard until it was too late to withhold any significant capital contributions.

Closely related to the sewerage permit problem is the difficulty encountered with an adjacent land developer—Miller Builders—over responsibility for the undersizing of sewer pipelines which prevented the Westmont project from getting even local government approval. Plaintiffs here cite a letter from defendant Kupperman to the president of Miller Builders, dated October 30, 1972, describing the inability of Westmont to get a permit because of the actions of Miller and the "three month delay" already encountered, and stating that "[t]his letter to you is my last rational resort . . before I do something that will be distasteful for all of us." Plaintiffs again assert that they were given no notice of this problem which was, apparently, sufficiently serious to drive Mr. Kupperman to his "last resort."

During this entire time frame, however, other preparations were apparently proceeding apace in an effort to produce the considerable improvements advertised in the developers' brochure of August 25,

1971; shown in the attractive rezoning petition submitted on January 12, 1972; and contemplated in the Limited Partnership Agreement of June 1972. The fees for this preliminary architectural, engineering, and contracting work (shown in the record to amount to some $300,000) were charged by the developers to the limited partnership and were paid by the limited partners.

The investors argued at trial, however, and introduced evidence tending to prove that even this planning function, which was more within the control of the developers, did not progress smoothly. They asserted that the "inability of personnel employed by developers to agree upon the design of buildings and a site plan . . . resulted in substantial and very costly delays" which were not related to the limited partners. This delay in the site plan preparation could also have accounted for the developers' failure to present a site plan to secure the contemplated construction financing from the First Chicago Corporation.

Plaintiffs still insist that they had no knowledge whatsoever of the increasingly serious difficulties being encountered by the developers. They assert that the only meaningful communications received from the "inner circle" of the general partners were calls for capital under the terms of the agreement.

The developers interpret the facts somewhat differently,[11] claiming that the only reason actual construction did not commence during the fall of 1972 was the impending sale to Larwin. They insist that Freeman was intimately familiar with all the inside information necessary to know what was really happening. As evidence of this latter fact, they cite Freeman's increasingly hostile attitude toward Douglas through 1972 and his insistence on Douglas' removal as a General Partner in March of 1973.[12] Even the defendants admit, how-

---

11. Since the trial of this action resulted only in a general jury verdict, there are no findings of fact resolving factual disputes. We recognize that a jury at a new trial will resolve for itself the facts in contention and draw the necessary inference therefrom.

12. Freeman apparently negotiated the terms of Douglas' withdrawal from the partnership. One of these terms was a complete release of Douglas from any claims by the remaining partners which might have arisen from Douglas' acts as a General Partner.

ever, that Freeman's dissatisfaction with Douglas arose more from Douglas' performance in *another* project than from any shortcomings of which Freeman might have known concerning the Westmont deal.

The apparent final blow to the Westmont Project as originally planned appears to have occurred in March of 1973, when the developers (specifically defendant Kupperman) wrote to the Westmont Village manager and requested the return of $140,000 which the partnership had previously paid to the Village to obtain the necessary building permits. Notwithstanding this apparent concession that the long, downhill slide of the Westmont Project had, for whatever reasons, resulted in the death of Phase I construction [13] as it had been contemplated, the General Partners, thereafter, made a $500,000 capital call in April of that year, specifically on the advice of counsel,[14] omitting to mention the purpose of the call or the use to which the capital would be put.

Ironically, and also in the spring of 1973, a second amendment to the Limited Partnership Agreement was executed. The purpose of this amendment was to formalize Douglas' withdrawal as a General Partner; paragraph fifteen of this second amendment reads as follows:

> The Limited Partners and each of them do hereby release and forever discharge Raymond Epstein, Sidney Epstein and/or Melvin M. Kupperman from any and all claims, debts, liabilities, payments, obligations, actions and causes of action of every nature, character and description which the Limited Partners or each of them hold as of the date of actual execution of this Second Amendment or have ever held against Raymond Epstein, Sidney Epstein and/or Melvin M. Kupperman arising out of or in any way connected with the partnership.

It was some months after this spring of 1973 capital call and Limited Partnership Agreement amendment that the investors finally became aware that Phase I had been abandoned. Nevertheless, the developers subsequently made one further capital call [15] and kept the project going for many more months, apparently in an effort to liquidate the partnership's holdings in as expeditious and economically rewarding a manner as possible under the circumstances.[16] The final months of the venture degenerated into a series of formalistic letters between the General and Limited Partners, pertaining mostly to accounting and disbursement of funds, in which each side was apparently jockeying for position in the lawsuit which was then looming ever more ominously over the horizon.

When the suit finally was filed on February 23, 1976, plaintiffs sought total damages in the amount of $1,061,500, alleging that defendants had violated the federal

---

**13.** The Westmont Project was initially divided into three distinct phases for planning purposes. Phase I, the phase with which the investors and developers were initially concerned, involved the building of some 480 rental units occupying approximately 13 acres of the total land area.

**14.** The letter from Joseph Antonow, Esquire (also a limited partner in the Westmont venture) to defendant Sidney Epstein reads as follows:

> Enclosed herewith is the suggested form to be sent to the Limited Partners of D-E Westmont for the purpose of obtaining additional capital contributions from them.
>
> You will note the letter does not contain any reason for the additional amounts. The reason for that is that despite what you say in this letter, you will be asked to give an explanation by Lee Freeman or others, and I do not want to create a precedent so that

> each time you have to give an accounting. Moreover, the Partnership agreement does not require that you give an explanation for calling up to $3,000,000.
>
>     \*    \*    \*    \*    \*    \*
>
> Plaintiffs' Trial Exhibit 161

**15.** Evidence at trial indicated that this final capital call was made by the General Partners on June 6, 1974, to make interest payments on the real estate loan and to pay real estate taxes.

**16.** Communications from the General and Limited Partners during this period indicated that many other options were being actively pursued. Plaintiffs, however, argued and submitted some evidence tending to prove that the Epsteins attempted to interest a possible purchaser of the Westmont property in another real estate venture being assembled by the Epsteins.

securities laws (Count I), committed common law fraud (Count II), and breached the fiduciary obligation owed by General Partners to the Limited Partners in a limited partnership (Count III). A jury trial commenced before Judge Julius J. Hoffman in the United States District Court for the Northern District of Illinois, Eastern Division, on October 28, 1976. The trial lasted six full weeks and consumed some thirty trial days; the transcript of proceedings is more than 4000 pages in length, and there were in excess of 400 exhibits admitted into evidence. At the end of this considerable undertaking, Judge Hoffman read to the jury what amounted to more than 60 separate instructions[17] and the jury retired to deliberate in the late afternoon of Thursday, December 9, 1976. About an hour later, the jury executed a sealed verdict which was unsealed and read in open court the next morning. The jury returned a general verdict in favor of each of the three defendants and against each of the four plaintiffs on each of the three Counts.

Plaintiffs now appeal from the judgment entered on this general verdict on grounds, not that the verdict was contrary to the substantial weight of the evidence, but that substantial mistakes of law and errors in the conduct of the trial on the part of the trial judge tipped the scales in favor of defendants in what was, otherwise, a close and complex case.

## POSITIONS OF PARTIES ON APPEAL

Plaintiffs contend that the trial judge made substantial errors of law in each of four individual instructions which so prejudiced plaintiffs in regard to their Count I that a new trial on that Count should be mandated.[18] Plaintiffs' allegations of legal error in the instructions may be summarized as follows[19]:

### (1) *The validity of the release.*[20]

Plaintiffs contend that the trial court's instruction concerning the validity of the

---

**17.** Defendants contend, in their brief, that plaintiffs tendered a total of 32 requested instructions, of which 26 were given to the jury in whole or in substantial part.

**18.** At oral argument, counsel for plaintiff upon inquiry from the court, conceded that, although he would of course contend that a new trial was required on all three Counts, he had taken exception only to those instructions relating to Count I because he had read the instructions relating to Counts II and III and they had looked all right. Therefore, the alleged errors in the instructions relate only to Count I, the federal securities laws count. Other alleged trial errors relating to all counts are discussed *infra*.

**19.** We have taken the liberty of renumbering plaintiffs' allegations of error to allow for ease of discussion in the succeeding pages.

**20.** The pertinent part of the court's instruction on the validity of the release was as follows:
   In March of 1973 the plaintiffs released and discharged the defendants. And the D-E Westmont Limited Partnership released and discharged Lewis W. Douglas, Jr., another partner in the partnership from any and all claims or causes of actions arising out of the operation of the partnership to the date of the releases.
   The defendants assert these releases as a defense to the claims in this action. The plaintiffs assert that these releases were pro-

cured by fraud. The plaintiffs' burden with respect to the allegations in Count I is to prove by a preponderance of the evidence that the release and discharge of the defendants was procured by means of a securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 or Rule 10(b)(5) thereunder, both of which have previously been read to you by me.
   If you find from all of the evidence that the plaintiff has failed to prove by a preponderance of the evidence any one of the propositions necessary to show security fraud in obtaining the release and discharge of the defendants, then the releases are valid with regard to Count I.
          *     *     *     *     *     *
   In determining whether the plaintiffs' release and discharge of claims in Count I were procured by fraud, you should consider whether the plaintiffs received and retained benefits under the agreement containing the release after learning of the facts which they now assert as a basis for the claim that the release was fraudulently procured.
   The retention of such benefits, if any, after learning those facts is inconsistent with the claim that the releases were fraudulently procured.
   A person is not justified in relying on an alleged misrepresentation as to a contract he signs when he has been afforded the opportunity to read it, but through his neglect fails to

release contained in the Second Amendment to the D-E Westmont Limited Partnership Agreement was premised on the view that only fraudulently induced releases of causes of action under the federal securities laws are invalid; that it failed to convey to the jury the controlling principle that a release is valid only if it relates to a fully matured cause of action; and that it failed to state that the person releasing the cause of action must have had full knowledge of such cause of action at the time the release was executed if the release was to be upheld.

Plaintiffs base their arguments in this area largely on the "strong policy" they find in the federal securities laws against the release of unknown or subsequently maturing causes of action. Plaintiffs assert that a purported release may be valid only if it is a deliberate, intentional waiver of rights of which the waiving party had full, contemporaneous knowledge at the time of the waiver. Plaintiffs cite section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(a),[21] and several related cases to bolster their contention that the waiver of a not-yet-fully-ripened cause of action should not be recognized by this court. They also assert that plaintiffs' trial counsel objected to the trial judge's instruction when it was given.

(2) *The means of knowledge and the due diligence defense.*[22]

Plaintiffs argue that the trial court, though not using express terms, gave a standard knowledge and means of knowledge instruction which had the clear effect of requiring plaintiffs to show that they exercised "due care" or "due diligence" with respect to their investments. The standard knowledge instruction, given near the beginning of the trial judge's considerable instructions and not applying to any specific Count, could, argue the plaintiffs, reasonably have been understood by the jury to apply to all Counts. In addition, the trial judge's continued reference to care or diligence or inquiry requirements of the plaintiffs with respect to various other issues raises the substantial possibility that the jury could have found against plaintiffs on even the federal securities cause of action (Count I) because they found that the plaintiffs had not exercised due care or diligence.

Plaintiffs conclude that such a rationale for a finding against plaintiffs would clearly be incorrect as a matter of law since the Supreme Court's decision in the case of *Ernst & Ernst v. Hochfelder.*[23] Plaintiffs argue that since the *Hochfelder* opinion requires reckless or intentional deceptions in order to sustain a Rule 10b–5 action, it

do so. Thus, no plaintiff may base a claim of fraudulent procurement of the releases upon alleged misrepresentations as to the terms of the agreements containing the releases when such plaintiff had an opportunity to read the agreements but failed to do so.

If you find that the plaintiffs have not met the burden of proving by a preponderance of the evidence that the release and discharge of the defendants from the claims in Count I was procured by fraud, you must find for the defendants with respect to all claims in Count I of which the plaintiffs knew or upon reasonable inquiry could have known before signing the release, which claims might have been submitted to and resolved in a court at the time the release was signed.

21. (a) Waiver provisions

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

15 U.S.C. § 78cc(a) (1976).

22. The pertinent part of the court's instruction relating to knowledge and the means thereof reads as follows:

The means of knowledge are ordinarily the equivalent in law to knowledge. So if it appears from the evidence in the case that a person had information, which would lead a reasonably prudent person to make inquiry through which he would surely learn certain facts, then this person may be found to have had actual knowledge of those facts, the same as if he had made such inquiry and had actually learned such fact. That is to say the law will charge a person with notice and knowledge of whatever he would have learned upon making such inquiry as would have been reasonable to expect him to make under the circumstances.

23. 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

would now be unfair to the plaintiff, and inconsistent with the policy objectives behind Section 10(b) and Rule 10b–(5), to continue to exonerate a willfully fraudulent defendant because of the innocent lack of care of a plaintiff. Plaintiffs here cite a recent case in this Circuit to demonstrate that the "due diligence" defense is no longer available in 10b–5 actions.[24]

(3) *Whether a limited partnership interest constitutes security.*[25]

Plaintiffs argue that a limited partnership interest is a security as a matter of law and that the trial judge's instructions improperly submitted to the jury the question of whether plaintiffs' interests constituted securities under the federal securities laws. Plaintiffs cite case law [26] holding that limited partnership interests constituted securities as a matter of law and then demonstrate that, under the Illinois law of limited partnership, the interests of the plaintiffs here met the test established by the Supreme Court for determining whether a financial interest is, in fact, a "security." Plaintiffs maintain that theirs was an "investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." [27]

Because of the emphasis which defendants placed on the participation of Freeman in the preliminary arranging of financing for the project and because a limited partnership interest bears little resemblance to what lay jurors would consider a "security," plaintiffs contend that the submission of this issue to the jury, particularly in the face of the considerable weight of legal authorities to the contrary, was so prejudicial as to necessitate a new trial in that the jury's general verdict in favor of all defendants on Count I, the federal securities count, could easily have been premised on the conclusion that plaintiffs, as limited partners, did not hold "securities."

(4) *The proper rule to be used in determining when a "purchase" of a security occurs.*[28]

Plaintiffs' strongest contention stems from the instruction to which they most clearly and strenuously took exception at trial. They argue that the trial judge's instructions on the determination of the point in time when the "purchase" or "sale"

---

24. *See, Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.) *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), discussed in detail *infra*.

25. The pertinent part of the court's instruction on whether a limited partnership interest is a security reads as follows:
    For the purposes of Count I, if you find that a limited partnership interest obtained by plaintiff constituted a security, the purchase of such security occurred when such a plaintiff was committed or obligated by agreement to acquire such interest, even if such plaintiff was to perform his or her obligations under the agreement after a lapse of time, each subsequent capital contribution made pursuant to such an agreement does not constitute a purchase of a security.

26. *E. g., Ahrens v. American-Canadian Beaver Co.*, 428 F.2d 926 (10th Cir. 1970); *Hirsch v. duPont*, 396 F.Supp. 1214 (S.D.N.Y.1975).

27. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). *See also SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

28. The pertinent part of the court's instruction relating to the determination of the point in time when a "purchase" occurs reads as follows:
    For the purposes of Count I, if you find that a limited partnership interest obtained by a plaintiff constituted a security, the purchase of such security occurred when such a plaintiff was committed or obligated by agreement to acquire such interest, even if such plaintiff was to perform his or her obligations under the agreement after a lapse of time, *each subsequent capital contribution made pursuant to such an agreement does not constitute a purchase of a security.* (Emphasis added)
    This was given only *after* the court rejected plaintiffs' proposed instruction on this issue:
    [Y]ou are instructed to find that each respective capital .contribution by a plaintiff to the D-E Westmont Limited Partnership as an investment in that real estate construction project constituted a separate purchase of a security.

of a security occurred (*if* the jury concluded that it was a security which plaintiffs actually purchased) amounted, in the context of this case, to an incorrect directed verdict in favor of the defendants on Count I. Plaintiffs particularly complain of one clause of the instructions which was read to the jury,

> . . . The purchase of such security occurred when such a plaintiff was committed or obligated by agreement to acquire such interest, even if such plaintiff was to perform his or her obligations under the agreement after a lapse of time, *each subsequent capital contribution made pursuant to such an agreement does not constitute a purchase of a security.* . . . (emphasis added)

arguing that this clause was "in effect a peremptory direction to the jury that only the limited partnership agreement itself could be considered the 'purchase' of a security."

While plaintiffs concede that there is no authority which specifically decides that each contribution of capital under a limited partnership agreement constitutes a separate "purchase" of a security, they strongly assert that a holding to the contrary (which is, plaintiffs say, what the trial judge's instruction to the jury constituted) would contravene the strong public policy against investment fraud embodied in securities laws.

The crux of plaintiffs' basic argument lies in the rationale that the original "commitment" to a limited partnership venture is not the final investment decision to be made over the course of what may be a relationship of many years' duration. To buttress their assertion that each subsequent call for capital by the General Partners raises a separate investment decision, the investors list six different options open to the Limited Partner at the time of his receipt of the capital call. A limited partner could (claim the investors): (1) comply with the call; (2) abandon the project; (3) sell his limited partnership interest; [29] (4) if he had any information tending to demonstrate fraud by the General Partners, refuse to contribute the called-for capital and defend against the General Partners' suit (if, indeed, one was brought) on the basis of breach of the Limited Partnership Agreement by the General Partners; (5) file for a declaratory judgment ending his obligations to the Limited Partnership; or (6) file an action to dissolve the partnership and seek a return of prior contributions. [30]

Plaintiffs strongly assert before this court that the existence of all of these options at the time of each capital call renders the decision to invest more capital a true "investment decision" and makes the receipt of true and accurate information from the General Partners absolutely vital in reaching any kind of an informed determination. Plaintiffs cite several cases, which shall hereinafter be discussed at length, in support of this contention and argue that the trial judge's misapplication of the securities laws in this respect is so prejudicial as to mandate reversal and a new trial.

*Errors Alleged in Conduct of Trial*

In addition to these four assertions of errors in the trial court's instructions, plain-

---

29. In fact, two of the plaintiffs in this case, David L. and Mollie E. Goodman, became owners of an interest in the D-E Westmont Limited Partnership by purchasing that interest from Poncher, one of the original Limited Partners. Plaintiffs would argue that Poncher's decision to sell a portion of his interest constituted an "investment decision."

30. *See* Ill.Ann.Stat. ch. 106½ § 32 (Smith Hurd), which reads in pertinent part:

§ 32. Decree of dissolution by court
(1) On application by or for a partner the court shall decree a dissolution whenever:
. * * * * * *

(c) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business,
(d) A partner wilfully or persistently commits a breach of the partnership or agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him,
(e) The business of the partnership can only be carried on at a loss,
(f) Other circumstances render a dissolution equitable.
* * * * * *

tiffs complain of three errors in the court's conduct of the trial which were, purportedly so prejudicial that each demands reversal in its own right.

(a) Plaintiffs assert that the trial court, by overruling an objection to a cross-examination question intended to elicit from Freeman, Jr., the exact amount of his considerable 1971 total income, incorrectly allowed the jury to hear evidence that was "irrelevant to any issue in this case and was highly prejudicial to plaintiffs." They would argue that this error played neatly into the hands of the defense, which attempted throughout the trial to paint plaintiffs, in front of the lay jurors, as rich, sophisticated, tax-sheltering investors who should have known what they were getting into and should have been able to cover, from their extensive personal wealth, any losses arising from their financial maneuvering. They contend that the rule against admitting evidence of a party's income or wealth is a long-standing principle of our legal system.[31]

(b) Plaintiffs further argue that the trial court committed reversible error when it denied a motion for a mistrial after the defense counsel suggested, in the presence of the jury, evidence concerning Freeman's communications with the other Limited Partners was relevant to the case on the ground that Freeman had brought the suit essentially as a protective measure since he had taken an active part in the distribution of Partnership interests and feared that some of the other Limited Partners might sue him. The plaintiffs further argue that this initial error was compounded because the trial court never instructed the jury to disregard defense counsel's statement and

because no other evidence was ever introduced to support it. A combination of errors such as these, they assert, in conjunction with other errors, has previously been found sufficient to warrant a new trial.[32]

(c) Finally, plaintiffs assert that, despite plaintiffs' failure to object at the time of the statement, we should now find reversible error in a statement by defense counsel in his closing argument to the effect that none of the other Limited Partners had found reason sufficient to initiate suit against the defendants. This statement was made despite, and in the face of, a prior ruling by the trial court sustaining plaintiffs' objection to a question concerning the very same fact that no other Limited Partners had brought suit. Plaintiffs now urge that the judge in a district court is more than a mere observer or moderator and that we should correct his error in trial conduct despite plaintiffs' failure timely to object.

Defendants, of course, are not left speechless by these arguments by the plaintiffs. The primary thrust of defendants' response appears to be that, when considered against the background of a thirty-day trial with its 400 exhibits and 4400 pages of record, the errors asserted by the plaintiffs, if, indeed they were errors, were so insignificant that they could have had little effect on the eventual outcome of the trial or the decision by the jury to find so overwhelmingly in favor of the defendants on all three counts. They reply specifically to the plaintiffs' contentions of error as follows:

(1) *The validity of the release.*

The defendants' simplest response to this allegation is that there was no error. They

---

**31.** Plaintiffs cite the following passage from an 1899 case to support their contention:

It has ever been the theory of our government, and a cardinal principle of our jurisprudence, that the rich and poor stand alike in courts of justice, and that neither the wealth of the one nor the poverty of the other shall be permitted to affect the administration of the law. Evidence of the wealth of a party is never admissible, directly or otherwise, unless in those exceptional cases, where position or wealth is necessarily in-

volved in determining the damages sustained. As to this general proposition there can be no doubt, and no authorities need be cited.
*Laidlaw v. Sage*, 158 N.Y. 73, 52 N.E. 679, 690 (1899).

*See Berguido v. Eastern Air Lines, Inc.*, 35 F.R.D. 200, 211–12 (E.D.Pa.1964).

**32.** *See Kiefel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1165 (7th Cir. 1968), *cert. denied*, 395 U.S. 908, 89 S.Ct. 1750, 23 L.Ed.2d 221 (1969).

contend that the instruction properly directed the jury that only known,[33] *matured* claims could be released under the federal securities laws and that such an interpretation is perfectly in keeping with the interpretation which various courts have given to Section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(a) (1976), relied upon so heavily by the plaintiffs,[34] and with the underlying policy of the securities laws.

The defendants continue their rejoinder on this allegation of error with the assertion that even if there were some legal imprecision in the court's release instruction, plaintiffs cannot now be heard to allege error in that instruction because they did not take proper objection to that portion of the instruction which referred to releasing claims "which the plaintiffs knew or upon reasonable inquiry could have known before signing the release." In addition, they continue, the plaintiffs did not submit an instruction which could have corrected the alleged error of which they now complain; therefore, they are further precluded from now alleging error.

### (2) *The means of knowledge and the due diligence defense.*

Defendants' response to plaintiffs' allegations of error on this issue is centered on the contention that the trial court's "means

---

**33.** For purposes of defendants' argument and the court's instruction on this validity of the release issue, a "known" claim includes those claims of which plaintiffs could have acquired knowledge "upon reasonable inquiry."

**34.** *See Korn v. Franchard Corp.,* 388 F.Supp. 1326, 1329 (S.D.N.Y.1975); *Mittendorf v. J. R. Williston & Beane, Inc.,* 372 F.Supp. 821, 835 (S.D.N.Y.1974).

**35.** *Citing Nolan v. Greene,* 383 F.2d 814, 816 (6th Cir. 1967); *Allers v. Bohmker,* 199 F.2d 790, 792 (7th Cir. 1952).

**36.** Plaintiffs, at oral argument before this court, pointed out that although the trial judge had, indeed, read two of three paragraphs submitted by plaintiffs, he omitted to read the third paragraph which was the peremptory direction to the jury to find that a limited partnership interest was a security. The trial judge read to the jury:

of knowledge" instruction had nothing to do with a "due diligence" defense under Count I. They state that they did, in fact, tender to the court a "due diligence" instruction with relation to Count I, but that it was specifically rejected; they argue that plaintiffs' brief inaccurately frames the court's standard "means of knowledge" instruction (to make it look like a "due diligence" instruction) by excerpting and then joining different instructions covering different subjects from among 37 pages of transcript; they urge that a "means of knowledge" instruction was appropriate within the context of this case—as evidenced by plaintiffs' failure to object properly to the "means of knowledge" instruction at trial; and, they conclude that, if the trial judge's instructions are read as a whole, as they should be,[35] rather than in the selective, piecemeal fashion suggested by the plaintiffs, the instructions constituted an accurate interpretation of the law and provide no grounds for reversal.

### (3) *Whether a limited partnership interest constitutes a security.*

Defendants strenuously assert, on this issue, that plaintiffs cannot be heard to allege error on appeal, since the trial judge read from an instruction tendered by the plaintiffs, to which the plaintiffs took no proper objection at trial.[36] They cite Rule

---

The plaintiffs must prove that their respective capital contributions to the D-E Westmont Limited Partnership were securities. A security is defined under the Federal securities laws as being a contract, transaction or scheme whereby a person invests his money in a common enterprise and is lead [sic] to expect profits solely from the efforts of a promoter or third party.

\* \* \* \* \* \*

He omitted to read:
You are instructed that plaintiffs have discharged their burden of proving that they are purchasers of securities and you are instructed to find that each respective capital contribution by a plaintiff to the D-E Westmont Limited Partnership as an investment in that real estate construction project constituted a separate purchase of a security.

Plaintiffs assert that their failure to take exception to this omission may be excused by the fact that they had twice before, during the

51 of the Federal Rules of Civil Procedure [37] and recent decisions of this court [38] as controlling for the principle that a failure properly to object to an instruction before the jury begins deliberation precludes the non-objecting party from assigning error on appeal.

In addition to this procedural argument, defendants also respond that, even if the plaintiffs' failure to object be excused, no reversal is mandated because the trial judge was correct, in the circumstances of this case, in leaving to the jury the question whether a limited partnership interest constituted a security. They argue that there were factual disputes, eliciting conflicting evidence at trial, on at least two of the three factors to be considered in determining whether a financial interest is a security [39]—the motivation of the investors and the degree to which the investors actually relied on the management efforts of others. They point out evidence which could have been interpreted by the jury as showing that the motivation of the investors was loss (for purposes of tax reductions) rather than the "profit" required by the Supreme Court's three-part test; further they argue that evidence of Freeman's considerable efforts at arranging the financing could have been interpreted as showing that he, at least, was not relying solely on the "entrepreneurial or managerial efforts of others." [40] Defendants conclude that the necessary factual determinations arising from this conflicting evidence could only have been resolved by sending the question to the jury and that the trial judge, therefore, was entirely correct in submitting the question to the jury.

(4) *The proper rule to be used in determining when a "purchase" of a security occurs.*

Again, defendants' response here is that the instruction given to the jury was a perfectly correct statement of the law. Relying on *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876 (2d Cir. 1972), and its progeny, they contend that a "purchase" (or "sale") of a security occurs when the original commitment is made by a buyer to purchase or a seller to sell, or, in other words, when there is a "meeting of the minds" between those two parties. Since Rule 10b–5 prohibits only material misrepresentations "in connection with the purchase or sale" of a security, defendants argue, any alleged misrepresentation or omission occurring after the date of the original commitment cannot be "in connection with the purchase or sale" of the security; or omissions occurring after the date of commitment cannot possibly have any effect on the decision as to whether or not to invest.

The developers further argue that evidence of the investors' "commitment" at the time of the execution of the Limited Partnership Agreement was sufficient to raise a factual question that had to be decided by a jury; that *clearly each additional contribution need not necessarily constitute separate purchases;* and that, therefore, the trial judge was absolutely correct in submitting this question to the jury.

---

course of the trial, had assertions of like position rejected by the judge. They believed any reassertion of the point that a Limited Partnership agreement is a security as a matter of law would have been futile.

37.  This Rule states in pertinent part:
. . . no party may assign as error the giving or failure to give an obstruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds for his objection.
Fed.R.Civ.P. 51.

38.  *United States v. Wright,* 542 F.2d 975, 981–82 (7th Cir. 1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977); *V-M Corp.* v. *Bernard Distrib. Co.,* 447 F.2d 864, 867 (7th Cir. 1971).

39.  The Supreme Court has determined that a "security" is present where there exists:
■ an investment in a common venture [2] premised on a reasonable expectation of profits [3] to be derived from the entrepreneurial or managerial efforts of others.
*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

40.  A question arose at oral argument, but was left unanswered, concerning the possible effect which the actions of Freeman could have had on the claims of the other plaintiffs.

### Errors Alleged in Conduct of Trial

The defendants, in addition, reason that none of the errors in the conduct of the trial alleged by plaintiffs is of sufficient magnitude—if, indeed, they are errors at all—to warrant reversal. In fact, they marvel that plaintiffs could find only three small "errors" of which to complain in a trial of the magnitude and complexity of this one.

(a) Defendants argue that the trial court correctly overruled plaintiffs' objection to a cross-examination question to Freeman, Jr., concerning his total 1971 income, since matters pertaining to his income and wealth were put in issue during direct examination by his own counsel. Such questions were, contend defendants, particularly relevant to the issue of the possible tax planning motivation of the investors in entering the D-E Westmont Limited Partnership in the first place. Defendants also note that plaintiffs took no objection to similar questions asked of Freeman concerning his 1972 and 1973 income, and conclude that a trial court's ruling on cross-examination cannot be disturbed on appeal in the absence of a clear abuse of discretion.

(b) The developers further argue that the trial court properly declined to order a mistrial as a result of the statement by their counsel, in the presence of the jury, that Freeman may have brought the instant suit to avoid being sued himself by one or more of the other Limited Partners. They contend that their attorney made the statement only in an attempt to explain, at the invitation of plaintiffs' counsel, the relevance in a particular line of questioning, and conclude that, since the denial of a motion for mistrial is quite properly committed to the broad discretion of the trial judge, there is certainly no reason here for a reversal.

(c) Defendants finally argue that, since plaintiffs never objected to the remarks of defendants' counsel in his closing argument, to the effect that none of the other Limited Partners had found grounds to sue, they now are precluded from raising this allegation of error on appeal. Further, defendants contend, there was nothing in the remark to affect seriously the basic "fairness, integrity or public reputation of . . . [these] proceedings."

As can be seen, the numerous arguments in this complex case make any kind of a facile solution impossible. Unappealing as is the prospect of reversing a proceeding which has required such expenditures of time and money from both the parties and the courts, we must nevertheless determine whether the interests of fairness and justice demand a new trial. We agree, in general terms, with the defendants' position that the four alleged mistakes of law in the instructions and the three alleged errors in the conduct of the trial are remarkably few. Although plaintiffs failed properly to preserve certain errors which they now raise on appeal, they did take proper objection to the instructions of the trial judge pertaining to a portion of Count I. Therefore, plaintiffs did preserve for appeal a crucial error of law concerning *when* the purchase of a security occurs.

For the reasons stated below, we reverse the jury verdict entered in the District Court and remand for a new trial on Count I.

### DISCUSSION

(1) *The validity of the release.*

Both parties appear to be in basic agreement that Section 29(a) of the Securities Exchange Act of 1934 [41], as interpreted by the courts, mandates that a purported release of claims under the federal securities laws is valid *only* as to mature, ripened claims of which the releasing party had knowledge before signing the release.[42]

---

41. 15 U.S.C. § 78cc(a). *See* note 21, *supra*.

42. This agreement comports generally with our interpretation of previous court rulings in this area. The landmark opinion is the case of *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98

L.Ed. 168 (1953), cited by both parties, which clearly states that any attempt to release a claim *in futuro* is invalid. 346 U.S. at 435, 74 S.Ct. 182. This case has had numerous proge-

The basic difference between the parties here appears to center on the question of whether the "knowledge" which a releasing party must have of the existence of the claims includes those things of which "he should have known upon reasonable inquiry." The defendants base their argument in this regard largely on two district court cases in which the courts held that general releases were valid as to claims as to which plaintiffs had "actual knowledge" or which they could "upon reasonable inquiry, have discovered." *Mittendorf v. J. R. Williston & Beane, Inc.,* 372 F.Supp. 821, 834 (S.D.N.Y.1974); *see also, Korn v. Franchard Corp.,* 388 F.Supp. 1326, 1332 (S.D.N.Y.1975). These opinions, followed almost to the word by the trial judge's instructions in the present case, do, indeed, appear to extend the scope of knowledge to include that which could have been discovered upon reasonable inquiry.

Plaintiffs' counter-reasoning that the scope of "knowledge" should be limited to actual, specific knowledge is based generally upon the judicial hostility to securities claim releases which they find in a number of cases [43] and particularly upon the opinion of the district court in *Childs v. RIC Group, Inc.,* 331 F.Supp. 1078 (N.D.Ga.1970), *aff'd,* 447 F.2d 1407 (5th Cir. 1971) (per curiam). In that case, the court determined that "[a] party does not waive . . . rights without acting in full knowledge thereof." 331 F.Supp. at 1083.

▮ Of these two apparently competing philosophies, we find, for the reasons stated below, that the defendants' theory which admittedly places some duty of inquiry on the party signing the release, is the more readily acceptable as fulfilling the policy requirements of the federal securities laws and needs of judicial economy.

The only questions which must be resolved prior to the acceptance of this "reasonable inquiry" philosophy, in the circumstances presented here, stem from the Supreme Court's decision in the case of *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In that opinion, handed down more recently than either *Korn* or *Mittendorf,* the Court held that only intentional deceptions were actionable under Rule 10b–5 and that plaintiffs could, therefore, no longer recover for merely negligent misrepresentations or omissions. 425 U.S. at 193, 96 S.Ct. 1375.[44] While we will discuss the ramifications of this decision more fully in our "Means of knowledge" section, *infra,* several courts, including this one, have now determined that the outcome in *Hochfelder* necessitates a move away from requiring the plaintiff to have exercised "due diligence" in acquiring knowledge about his investments before allowing him to recover from the defendant.[45] The rationale behind doing away with the "due diligence defense" seems compelling, so we are concerned that, by requiring "reasonable inquiry" (which may be interpreted to have a meaning similar to "due dili-

---

ny which have fleshed out the standard, *i. e.,* that Section 29(a) does *not* bar a release or settlement of an existing, matured claim but only "anticipatory waivers of compliance with the provisions of the Securities Exchange Act of 1934 . . . ." *Korn v. Franchard Corp.,* 388 F.Supp. 1326, 1329 (S.D.N.Y.1975). *See also Special Transportation Services, Inc. v. Balto,* 325 F.Supp. 1185, 1187 (D.Minn.1971).

**43.** *Citing Murtagh v. University Computing Co.,* 490 F.2d 810, 816 (5th Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 62 (1974); *Zapach v. Elkins, Morris, Stroud & Co.,* 375 F.Supp. 669 (M.D.Pa.1973); *Childs v. RIC Group, Inc.,* 331 F.Supp. 1078 (N.D.Ga.1970), *aff'd,* 447 F.2d 1407 (5th Cir. 1971) (per curiam).

**44.** The Court, in its now-famous footnote 12, specifically decided not to reach the issue of whether recklessness could constitute "intent" for 10b–5 purposes. This Circuit has decided that it can and does. *See Wright v. Heizer, Corp.,* 560 F.2d 236, 251 (7th Cir. 1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978), *citing Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

**45.** *See, e. g., Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Holdsworth v. Strong,* 545 F.2d 687 (10th Cir. 1976) (en banc), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977).

gence") of an individual signing a release of a securities claim, the trial court may have allowed the "due diligence defense" to slip in through the back door.

The trial court's instruction on this matter required the jury to determine whether there had been fraud *in the procurement* of the release. If the jury determined that there was no such fraud, then they were instructed, essentially, that the plaintiffs had a duty to inquire into the matter concerning which the release was executed. Although the remaining portion of the instruction concerning the maturity of the claim was, perhaps, not as explicit as desirable, we believe that the portion concerning knowledge of the claim comports sufficiently with the law and with common sense so as not to necessitate, in itself, a new trial.

The *Korn* and *Mittendorf* philosophy, adopted by the trial court here, does not run counter to either the letter or the spirit of *Hochfelder*. The *Hochfelder* decision and its progeny require us to move away from a "due diligence defense" [46] with regard to the substantive merits of a 10b–5 claim; however, we perceive a significant distinction to be drawn between the substantive merits of a 10b–5 claim and an attempted release thereof. In the substantive merits aspect of the case, it appears only fair that a plaintiff, compelled to prove that the defendant committed an intentional or reckless deception, should not also be forced to prove that he (the plaintiff) did not in any way contribute to his own harm.

A totally different situation occurs, however, when we are dealing with a plaintiff who has affirmatively acted to release another party from any possible liability in connection with a transaction in securities. The mere fact that an individual has been asked to sign a release should be sufficient to put that individual on notice that a reasonable inquiry should be undertaken. No longer do we have the innocent investor sitting back and merely holding his security; we are not requiring an innocent investor *continually* to question management concerning his investment, but only to undertake a "reasonable inquiry" prior to taking the affirmative act of signing a release.

That "reasonable inquiry" will assuredly differ from situation to situation. In many cases, it may involve only the questioning of the person or persons seeking the release; any deception by those persons at that point could amount to fraud in the procurement of the release, which would clearly have invalidated the release under the trial court's instruction in this case.

The requirement that a person exercise reasonable inquiry to discover possible matured claims existing at the time of execution of a waiver does nothing to defeat the general policy against the *in futuro* waiver of securities claims. *See, e. g., Wilko v. Swan, supra.* Quite to the contrary, it insures that the signing of a waiver is something that will not be undertaken lightly, with the expectation that the waiver will be unenforceable even as to existing claims because the party executing the waiver kept his eyes closed, and therefore did not "know." Such a "reasonable inquiry" policy also favors the *honest* settlement of claims which is recognized as essential to the continued functioning of our judicial system. *See, e. g., Mittendorf v. J. R. Williston & Beane, Inc., supra,* 372 F.Supp. at 835.

Thus, although we are aware that the trial judge's instructions to the lay jury on this complicated securities matter may not have been as clear as would have been desirable, we believe that they contained an essentially correct statement of the law concerning releases of securities claims and, therefore, do not constitute reversible error. Because of our conclusion that the trial judge correctly stated the law, we need not reach here the further question of whether plaintiffs properly objected and preserved their right to appeal from this instruction.

(2) *The means of knowledge and the due diligence defense.*

Closely related to our discussion in the previous section is plaintiffs' assertion that

---

**46.** See our discussion in section 2, *infra.*

the trial judge's instructions incorrectly required the jury to determine that the plaintiffs had exercised "due diligence" before it could find in favor of the plaintiffs. As we stated, the decision of the Supreme Court in *Hochfelder* has necessitated an entirely new look at the duty of care which should be imposed upon a plaintiff in a 10b–5 action.

Although the Supreme Court made no specific pronouncement in *Hochfelder*, the Court of Appeals for the Tenth Circuit recognized the new limitation on the "due diligence defense" in *Holdsworth v. Strong*, 545 F.2d 687 (10th Cir. 1976) (en banc), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977),[47] and this Circuit has also recently ruled that "due diligence" is no longer a defense to Section 10(b) and Rule 10b–5 liability:

> Under a negligence standard of liability, plaintiff could not justifiably claim reliance if he had not exercised due diligence. But under a reckless or *Hochfelder Scienter* standard, "[i]f contributory fault of plaintiff is to cancel out wanton or intentional fraud, it ought to be gross conduct somewhat comparable to that of defendant." [Citations omitted.]

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1048 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), *quoting Holdsworth v. Strong*, *supra*, 545 F.2d at 693. Thus, it would appear that, if the trial court's instructions did, indeed, require "due diligence" of the investors, plaintiffs have now raised a valid point on appeal.

Plaintiffs' position, however, is assailable in two highly relevant aspects. First, it is doubtful that the trial court's instruction could be read as requiring "due diligence" on the part of plaintiffs with regard to Count I; even if it could be so read, it is even more doubtful that plaintiffs properly preserved any error for appeal.

Since the record makes clear that the trial court, in its instructions, never imposed a specific requirement on the plaintiffs that they must demonstrate their "due diligence" in order to recover on Count I,[48] plaintiffs' appeal here is necessarily reduced to a complaint that an unfortunate "spill-over" occurred between the knowledge instructions of the other Counts and those of Count I.

■ Our remand as to only Count I, along with an effort by the new trial court clearly to differentiate the differing knowledge requirements which we have imposed for the merits of a Rule 10b–5 claim and for the release or waiver thereof,[49] should result in a "cleaner" trial insofar as the means of knowledge is concerned and should eliminate many of the possible opportunities (which existed in the previous trial) for confusion among the jurors. Because we thus determine that there was no legal error to be found in the instructions of the trial court on the means of knowledge and its relevance to the various Counts, we need not reach here defendants' further

---

**47.** That portion of the Tenth Circuit's opinion in *Holdsworth* which is particularly interesting for our purposes reads as follows:

> The importance of *Ernst & Ernst* in the present case is that it calls for scrutiny of the defense of due diligence and prompts the question whether it applies to these facts even if it is applicable to more extreme circumstances. Since the plaintiff must prove his case in terms of the standard of scienter, doubts are cast on its usefulness where it allows the fraudulent actor to escape liability by saying that if the plaintiff had been diligent, he would not have allowed himself to be cheated. If plaintiff must prove scienter and at the same time the defendant is allowed to defend on this basis, the general effect on the remedy is of great magnitude and the action lies only in an extraordinary

case. Even in the exceptional case the defendant would likely be able to demonstrate some lack of diligence on the part of the plaintiff. If contributory fault of plaintiff is to cancel out wanton or intentional fraud, it ought to be gross conduct somewhat comparable to that of defendant.

545 F.2d at 693.

**48.** Indeed, the rejection by the trial judge of the "due diligence" instruction tendered by the defendants clearly demonstrates his anticipation of our *Sundstrand* opinion and his recognition that such a defense was no longer available in a Section 10(b)/Rule 10b–5 securities action.

**49.** *See* our discussion in section (1) at 28–32, *supra*.

argument that plaintiffs failed properly to preserve their "knowledge" issue for appeal. We must, however, reach this question of proper objection in our next section.

(3) *Whether a limited partnership interest constitutes a security.*

On the question of whether the trial judge incorrectly left for the jury the question of whether an interest in a limited partnership constituted a security, we agree with plaintiffs that the trial judge should have made that determination and directed the jury that the interest present in this case was, as a matter of law, a security.

■ The basic test which has been enunciated by the Supreme Court for determining the existence of a security involves three elements: (1) an investment in a common venture (2) premised on a reasonable expectation of profits (3) to be derived from the entrepreneurial or managerial efforts of others, *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). A limited partner's interest in a limited partnership established under Illinois law meets, on its face, all of these requirements. The actual D-E Westmont Limited Partnership Agreement (with its amendments) further confirms that the three requirements are met.

■ We recognize that, in evaluating a financial interest to determine whether an "investment contract," or security, exists,

the substance of the transaction must be elevated over the form; that is, the existence or non-existence of an "investment contract" must be determined from the actual facts and circumstances of the investment arrangement and not from the existence or non-existence of a "stock certificate" alone. *See, e. g., Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *SEC v. C. M. Joiner Leasing Corp., Inc.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); *Daniel v. Int'l Brotherhood of Teamsters*, 561 F.2d 1223, 1231 (7th Cir.), *cert. granted*, 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1977); *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 100 (7th Cir. 1977); *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 276 (7th Cir.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). It is this very consideration which has allowed numerous courts to determine that a limited partner's interest in a limited partnership is an "investment contract" or "security," even though it does not have the normal trappings of what a lay person may think of as a security. *See, e. g., McGreghar Land Co. v. Meguiar*, 521 F.2d 822, 824 (9th Cir. 1975); *Ahrens v. American-Canadian Beaver Co.*, 428 F.2d 926, 929 (10th Cir. 1970); *Hirsch v. duPont*, 396 F.Supp. 1214, 1217 (S.D.N.Y.1975), *aff'd*, 553 F.2d 750, 758 (2d Cir. 1977). These courts recognized, as have the Securities and Exchange Commission [50] and several respected commentators,[51] that the very

50. *See*, S.E.C. Release No. 33–4877, August 8, 1967, which reads, in pertinent part:

Under the Federal Securities Laws, an offering of limited partnership interests and interests in joint or profit sharing real estate ventures generally constitutes an offering of a 'profit sharing agreement' or an 'investment contract' which is a 'security' within the meaning of Section 2(1) of the Securities Act of 1933. . . .

. . . [I]f the promoters of a real estate syndication offer investors the opportunity to share in the profits of real estate syndications or similar ventures, particularly when there is no active participation in the management and operation of the scheme on the part of the investors, the promoters are, in effect, offering a 'security'.

1 CCH Fed.Sec.L.Rptr. ¶ 1046 at 2062–2063. *See also*, 17 C.F.R. § 240.3a11–1.

It should be noted that the term "security," as defined in Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1976), includes the term "investment contract." The two terms have been used interchangeably, and the cases construing either term may also be used interchangeably. *See Daniel v. Int'l Brotherhood of Teamsters*, 561 F.2d 1223, 1231 (7th Cir. 1977), *cert. granted*, 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978).

51. Bromberg, for example, states:

Limited partners . . . are effectively precluded from participation in control by the threat of losing their limited liability. Perforce, they must rely on the investment efforts of general partners for profits. The investment contract concept is particularly applicable. [Citations omitted.]

legal requirements for a limited partnership necessitate its including all of the attributes of a "security" in the interest bestowed upon one of limited partners.

We do not accept defendants' assertion that they raised sufficient factual questions to necessitate the trial judge's sending this issue to the jury. A summary perusal of the evidence adduced at trial reveals no debatable question of the plaintiffs' interests meeting all three of the *Howey/Forman* tests. *See* note 39, *supra.*

There can be little doubt that each of the Limited Partners made an "investment in a common venture." Each parted with a significant sum of money [52] which was, according to the terms of the Agreement, to be pooled to accomplish a common purpose.[53] All of this was in accordance with the provisions of the Illinois Uniform Limited Partnership Act,[54] and met even the relatively more stringent requirements which this Circuit has placed on "commonality." [55] In addition, it is clear that the Limited

Partnership contributions were made "premised on a reasonable expectation of profit." Defendants have made much of the fact the evidence could have indicated that plaintiffs, particularly the Freemans, may have harbored some initial expectation of tax benefits to be derived from the partnership. Even if the jury had given credence to the evidence that the probability of an initial "loss," recognizable for tax purposes, was to be anticipated in a real estate development plan which was, as are many beginning business operations, heavily front-loaded with costs, such evidence would not compel a conclusion that the investors had insufficient expectation of *eventual* profit to meet the "reasonable expectation of profit" requirement. The probability of initial "tax losses" does nothing to change the underlying legal nature of the limited partnership interest nor to disturb the basic common sense presumption that business ventures are entered into for profit.[56] Indeed, if the investors had

---

1 Bromberg, Securities Law: Fraud, § 4.6(332), at 82.7 (1975)

Jennings and Marsh, in a particularly relevant section which interprets the effect of the Uniform Limited Partnership Act under which the D–E Westmont Limited Partnership was formed state:

. . . [U]nder the Uniform Limited Partnership Act, a limited partner may not take part in the control of the business; he must remain a passive investor. Limited partnership interests thus fall squarely within the definition of a 'security'. . . .

Jennings & Marsh, Securities Regulation 252 (1968).

**52.** Evidence indicates that the contributions or investments made by the plaintiffs in this suit are as follows:

| | |
|---|---|
| David L. Goodman | — $212,300 |
| Mollie E. Goodman | |
| Lee A. Freeman | — $488,790 |
| Lee A. Freeman, Jr. | — $360,910 |

**53.** The Limited Partnership Agreement stated, in pertinent part:

The purpose of the partnership shall be the residential development of approximately 107.93 acres in Westmont, Illinois, by the construction, ownership and operation thereon of residential structures and related facilities.

D–E Westmont Limited Partnership Agreement ¶ 2.

**54.** Ill.Ann.Stat. ch. 106½ §§ 44–73 (Smith Hurd). This law mandates that the signed and sworn limited partnership certificate filed with the state shall provide:

\* \* \* \* \* \*

II. The character of the business

\* \* \* \* \* \*

VI. The amount of cash . . . contributed by each limited partner

Ill.Ann.Stat. ch. 106½ §§ 45(1)(a) II, VI.

**55.** The United States Court of Appeals for the *Fifth Circuit* has interpreted the "commonality" requirement somewhat more liberally and has commented upon this Circuit's "more stringent interpretation." *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 479 n. 8 (5th Cir. 1974). The D–E Westmont Limited Partnership, however, clearly meets the requirements of even our "more stringent interpretation," which is thoroughly discussed in *Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96 (7th Cir. 1977), and *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972).

**56.** *Cf.* Ill.Ann.Stat. ch. 106½ § 32(1)(e) (Smith Hurd). (The Limited Partnership formed under Illinois state law, as was the D–E Westmont Limited Partnership, shall be dissolved by order of the court upon a showing by either a General or Limited Partner that the "business of the partnership can only be carried on at a loss.")

only entered into the deal in order to suffer an eventual loss, there would have been no reason for them to bring this action—a total loss is just what they suffered.[57]

Defendants' final thrust at disproving the existence of a "security" centered around their attempting to show Freeman's participation in the "management" of the D–E Westmont Limited Partnership. Despite the fact that the Uniform Limited Partnership Act, in effect in Illinois and under which the D–E Westmont Limited Partnership was chartered, precludes participation by Limited Partners in the management of the partnership, and despite the fact that plaintiffs have failed to contest the legality of the D–E Westmont Limited Partnership, defendants now point to evidence adduced at trial, which may have tended to show that Freeman earlier conducted extensive efforts to line up *financing* for the venture, in an attempt to demonstrate that Freeman's participation in the *management* of the partnership was such as to preclude his interest [58] from being a "security."

While Freeman's alleged participation in arranging financing or his relative proximity to the "management circle" may have been relevant and highly significant to the issue of Freeman's knowledge, or his means of knowledge, of the operation, and while it may have been sufficient to cloud the jury's perception in this test for the existence of a security (if, indeed, the jurors understood what the test was after the trial court's instruction), it was certainly insufficient to overcome the simple facts that Freeman, as a Limited Partner, was prohibited, by law, from taking part in the management of the corporation and that the defendants made no showing that Freeman had actually participated in any of the essential management decisions affecting the basic direction of the partnership.[59]

■ In light of the weighty authority for considering a limited partnership interest to be "security" within the protective scope of the federal securities laws, the trial judge should have given plaintiffs' requested instruction that plaintiffs' interests were se-

**57.** Defendants cite *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 855, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) in support of their contention that the expectation of a loss which may have certain tax benefits does not constitute the required "reasonable expectation of profit." Defendants, however, fail to note that the *Forman* Court found no "reasonable expectation of profit" at least in part because the brochures advertising the Co-op living arrangement did not feature the income-producing aspects of a Co-op living arrangement (as a means of off-setting costs) which the plaintiffs there claimed as profits. In contrast, the advertisement brochure which was published by defendants in the present case featured detailed financial projections for the "Healy Farm Project" (which became the D–E Westmont Limited Partnership venture) showing large figures for "net income" and "profit" which could be reasonably expected. These projections lend strong record support to the common-sense presumption that business ventures of this sort are entered into with an expectation of eventual profitability. Thus, defendants' efforts to prove that the "economic reality" of the interests held by plaintiffs, *see Daniel v. Int'l Brotherhood of Teamsters*, 561 F.2d 1223, 1235–37 (7th Cir. 1977), *cert. granted*, 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978), belied the legal definition of a limited partnership interest, failed to raise any disputable is-

sue of fact insofar as the profits part of the test is concerned.

**58.** Defendants have raised no argument, presented no authority, and reached no conclusion as to how Freeman's participation could even colorably have been construed to affect the legal standing of the interests of Freeman, Jr., and the Goodmans. Because of the view we take of Freeman's participation in the venture, we need not reach the question of whether this distinction makes any difference.

**59.** Even if Freeman had, in some small way, personally taken some part in earning the profit which he expected from his investment, we do not believe that would have affected the basic nature of his Limited Partnership interest as an "investment contract." We subscribe to the well-reasoned rationale of Judge Duniway in *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), where he stated that the portion of the *Howey* test which requires that the expected profit accrue "solely" from the efforts of others "should not be read as a strict or literal limitation on the definition of an investment contract." The Supreme Court apparently reached the same conclusion and removed the word "solely" when it updated the *Howey* definition in *Forman*. 421 U.S. at 852, 95 S.Ct. 2051.

curities.[60] The potential injustice resulting from the error was increased by the danger that plaintiffs' "securities" were something that might not comport with lay juror's concept of "securities."[61]

The failure of plaintiffs to make the objection required by Rule 51, Fed.R.Civ.P., is of no practical significance, because a new trial is required for another reason, and in the new trial plaintiffs will be entitled to a proper instruction on this aspect of the case.

(4) *The proper rule to be used in determining when the "purchase" of a security occurs.*

The item which constitutes grounds for reversal is the trial court's instruction to the jury on the means which the jurors should employ in determining if and when the "purchase" or "sale" of a security occurred. The record demonstrates that plaintiffs' counsel made a full and timely Rule 51 objection to the court's instruction which was read to the jury as follows:

> For the purposes of Count I, if you find that a limited partnership interest obtained by a plaintiff constituted a security, the purchase of such security occurred when such a plaintiff was committed or obligated by agreement to acquire such interest[;] even if such plaintiff was to perform his or her obligations under the agreement after a lapse of time, *each subsequent capital contribution made pursuant to such an agreement does not*

*constitute a purchase of a security.* (Emphasis added.)[62]

We agree with plaintiffs that, under the circumstances of this case, this instruction amounted to an incorrect peremptory direction to the jury that only the Limited Partnership Agreement itself could be considered the purchase of a security and that such a peremptory direction, again under the peculiar circumstances of this case,[63] clearly eliminated any chance of the plaintiffs' obtaining a favorable verdict on Count I.

As described earlier, the facts adduced at trial demonstrate that plaintiffs signed a Limited Partnership Agreement which provided for donations of capital by the Limited Partners from time to time upon calls therefore by the General Partners. After the signing, as provided for in the Agreement, the plaintiffs, on several occasions, complied with calls for capital by the defendants and, in total, contributed over one million dollars, none of which was recouped by the time this action was begun. Plaintiffs, basically, assert that the continued failure of the General Partners, over an extended period of time which eventually reached about two years, to inform the Limited Partners of the successively worsening prospects—or the eventual total abandonment—of the Phase 1 development for which the investment money was allegedly being expended, constituted a viola-

---

**60.** *See, e. g., Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 887 (2d Cir. 1972).

**61.** The trial court, in leaving this complex issue to the jury, provided the jurors with only the most cursory two-line instruction on how to identify a security. This abbreviated instruction, given almost in passing in the midst of extensive instructions on other Counts and issues, undoubtedly had the unfortunate effect of leaving the jurors with nothing more than a lay person's concept of what constituted a "security."

**62.** Although plaintiffs' counsel objected to this instruction, his only stated inaccuracy concerned the "timing of purchase" issue. As noted in section (3) *supra,* plaintiffs failed to take exception to the portion of this instruction reading ". . . *if* you find that a limited partnership interest obtained by a plaintiff con-

stituted a security. . . ." (Emphasis added.)

Defendants have not contested the fact that the purchase (or purchases), whenever it (or they) occurred was "for value." *See Daniel v. Int'l Brotherhood of Teamsters,* 561 F.2d 1223, 1242 (7th Cir. 1977), *cert. granted,* 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978), *interpreting* 15 U.S.C. § 77b(3). Thus, the only question we deal with here is the timing of the "purchase."

**63.** The D-E Westmont Limited Partnership Agreement was executed in June of 1972, but plaintiffs' suit was not filed until February 23, 1976. Thus, if the only "purchase" or "sale" of a security occurred in 1972, the three year statute of limitations would bar any claims in connection therewith, absent the additional proof of fraudulent concealment.

tion of the federal securities laws. Defendants, on the other hand, relying heavily on the "commitment doctrine" enunciated by the Second Circuit in *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876 (2d Cir. 1972), contend that the Limited Partners became "committed" on the date of the Limited Partnership Agreement and that any duty or obligation of the General Partners, under the federal securities laws, to furnish information to the Limited Partners ceased at that time.

Recent decisions of the Supreme Court teach us that, even though private federal securities fraud claims are judicially created, *see Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Blue Chip Stamps v. Manor Drugstores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), a determination of the law applicable to such a claim must begin with the "language of § 10(b) . . . itself." *Santa Fe Industries v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), quoting from *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), which in turn quotes from *Blue Chip Stamps v. Manor Drugstores, supra,* 421 U.S. at 756, 95 S.Ct. 1917 (Powell, J., concurring). Section 10(b) is addressed to deception "in connection with the purchase or sale of any security." The Supreme Court has interpreted the "in connection with" requirement broadly: To be actionable, the deception need only "touch" the transaction complained of. *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* 404 U.S. at 12–13, 92 S.Ct. 165, quoted with approval in *Santa Fe Industries v. Green, supra,* 430 U.S. at 476, 97 S.Ct. 1292. The words "purchase" and "sale" have similarly been broadly construed for § 10(b) purposes.[64] The 1934 Act itself defines these words more broadly than did the common law. 15 U.S.C. § 78c(a)(13), (14).[65]

■ To effectuate the broad remedial purpose of the federal security laws, they are to be construed liberally and flexibly.[66] As the *Radiation Dynamics* case, on which defendants rely so heavily recognizes:

Rule 10b–5 was intended to prevent those in possession of material inside information from using that information to their own advantage when dealing with others not possessing the same information.[67]

■ In determining the statute's coverage, "we must ask whether respondents' alleged misconduct is the type of fraudulent behavior which was meant to be forbidden

---

**64.** Cases interpreting the statutory terms flexibly include *Daniel v. International Brotherhood of Teamsters,* 561 F.2d 1223, 1242–1244 (7th Cir. 1977), *cert. granted,* 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978) ("purchase or sale"); *Dasho v. Susquehanna Corp.,* 380 F.2d 262 (7th Cir.), *cert. denied sub nom. Bard v. Dasho,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967) ("in connection with"); *Divine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) (same).

**65.** Paragraph (a)(13) provides:
The terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire.
Paragraph (a)(14) provides:
The term "sale" and "sell" each include any contract to sell or otherwise dispose of.
We stated in a case cited with approval by the Supreme Court in *S. E. C. v. National Securities,* 393 U.S. 453, 468, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), that because of the broad definitions of "sale" and "purchase," "[t]he purpose is evidently to make control of securities trans-

actions reasonably complete and effective to accomplish the purpose of the legislation." *Dasho v. Susquehanna Corp.,* 380 F.2d 262, 266 (7th Cir.), *cert. denied sub nom. Bard v. Dasho,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967).

**66.** *See, e. g., Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *Daniel v. Int'l Brotherhood of Teamsters,* 561 F.2d 1223, 1231 (7th Cir. 1977), *cert. granted,* 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978); *Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 99–100 (7th Cir. 1977).

**67.** 464 F.2d at 887. The question of the materiality of the information allegedly withheld by the General Partners in the case at hand was never addressed by the trial court in its instructions or by either party on appeal. We therefore express no opinion on the materiality (defined by Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)) of any fact.

by the statute and rule." *SEC v. National Securities,* 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969). Thus, in interpreting the phrase "in connection with the sale or purchase of any security," which does not admit of a precise definition, we must consider the facts of the particular case. *See, e. g., Allico Nat. Corp. v. Amalgamated Meat Cutters,* 397 F.2d 727 (7th Cir. 1968); *A. P. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir. 1967); *Ohashi v. Verit Industries,* 536 F.2d 849 (9th Cir.), *cert. denied,* 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976); *Richardson v. MacArthur,* 451 F.2d 35 (10th Cir. 1971); *see generally, Note,* The Pendulum Swings Farther: The "In Connection With" Requirement and Pretrial Dismissals of Rule 10b–5 Private Claims for Damages, 56 Texas L.Rev. 62 (1977).

In *Radiation Dynamics,* the Second Circuit was faced with a situation in which a party, Radiation Dynamics (RD), largely because of internal working capital requirements, sold stock of another company, TRG, and only then found out that TRG was in the process of negotiating a merger which was to be consummated some 3½ months later. As a result of this merger, the stock which RD had sold for $299,000 was traded by the defendants for some $690,270 worth of stock in the acquiring company, which was then sold within 2½ months at a profit of $391,270.

RD, characterized by the court as "a disgruntled seller," brought suit against the initial purchasers of the TRG stock, alleging that they had failed to disclose to RD material inside information concerning the prospective merger. At a jury trial, the evidence demonstrated that, in late May of 1964, RD had initiated a contact with Goldmuntz, the chief executive of TRG, who recommended several possible purchasers to RD; that on June 24, 1964, Goldmuntz agreed to purchase and RD agreed to sell

500 shares;[68] that Goldmuntz introduced RD to one Fisher, whom Goldmuntz knew was interested in purchasing blocks of TRG stock; that RD offered, on June 14, 1964, to sell some 3000 shares to a "California Group" (CG) assembled by Fisher; that RD acquired the 3500 shares to sell to Goldmuntz and the CG on July 30, 1964; that the sale to the CG was finally closed on August 3, 1964, and that the sale to Goldmuntz was completed on August 17, 1964.[69]

The evidence also indicated that certain parties within TRG had concluded that a merger was necessary for TRG's well-being as early as the first part of 1964. On June 22, 1964 (two days before the RD–Goldmuntz agreement) Goldmuntz had visited the offices of Aerojet-General in the process of merger discussions which were eventually aborted. On July 24, however, (ten days after the RD–California Group agreement but ten days before the closing) Goldmuntz was visiting the offices of Control Data Corporation (CDC) and viewed financial data not normally shown unless both parties were "seriously considering a merger." Dickering on terms continued from mid-August until mid-September when CDC presented an acceptable offer. The merger agreement was signed on November 12, 1964, and the shares exchanged in December.

The jury returned a special verdict in favor of the defendants, finding that neither Goldmuntz nor the California Group possessed "*material* information as to a *reasonably possible* . . . merger with Control Data"[70] when RD made its respective "commitments" to them. The plaintiff, on appeal, complained, among other things, of the trial judge's instruction which had made the important date for disclosure purposes the date upon which RD made its "commitment" to sell. In the final segment of an extensive opinion which affirmed the trial court on numerous points, the Second Circuit stated:

---

**68.** This later became 700 shares when another prospective purchaser failed to purchase his scheduled 200 shares. 464 F.2d at 881, n. 3.

**69.** Further sales of 2800 more shares followed, in August 1964, to a "Minnesota Group" which

was not involved in the jury verdict, having been dismissed from the case as defendants by the trial court at an earlier stage.

**70.** 464 F.2d at 884, n. 8.

. . . Judge Pollack correctly instructed the jury when he stated that the time of a "purchase or sale" of securities within the meaning of Rule 10b–5 is to be determined as the time when the parties to the transaction are committed to one another. A party does not, within the intendment of Rule 10b–5, use material inside information unfairly *when he fulfills contractual commitments which were incurred by him previous to his acquisition of that information*, for, as Judge Pollack instructed the jury, the Rule imposes "no obligation to pull back from a commitment previously made by the buyer and accepted by the seller because of after acquired knowledge." *The goal of fundamental fairness in the securities marketplace is achieved by such a determination.*

. . . "Commitment" is a simple and direct way of designating the point at which, in the classical contractual sense, there was a meeting of the minds of the parties; *it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.* . . *(Emphasis added.)* [71]

This same portion of the *Radiation Dynamics* opinion was quoted to us at length by defendants here and, standing alone, may appear to lend substantial support to the position they assert. A closer inspection, however, indicates that the facts before this court, and the underlying equities involved, are sufficiently different that a "wooden adherence" to the general proposition stated in the quoted language would not serve to further "the goal of fundamental fairness in the securities marketplace." A different rationale, the seeds of which have already been sown,[72] is now required.

In *Radiation Dynamics* the investment decision was completed at the time the parties entered into the agreement, the contract between purchaser and seller being, in effect, a "one-shot deal." No continuing relationship was contemplated. All that was left undone was the ministerial exchange of the money for the stock. The seller would have had no legal alternative to performing the contract even if it had acquired the information in question. Under these circumstances the information was not material and could not have been relied upon in making an investment decision. In other similar cases involving "one-shot deals" the same result has been reached on the same ground, *i. e.*, the information, even if supplied, would not have entitled the plaintiff to refuse to carry out the transaction.[73]

In the case now before us, the circumstances are substantially different from those faced by the *Radiation Dynamics* court. What we have here is *not* a one-shot deal. The seller-defendants were required (as General Partners under the terms of the Limited Partnership Agreement) to perform certain management functions which were the primary determinants of the value of the securities sold. Most of these management functions were to be performed after the execution of the Limited Partnership Agreement and the contributions of capital (though they could have been expressly lumped into one up-front payment) were spaced out, "from time-to-time," over the course of the management's performance. The parties clearly envisioned an ongoing relationship under the Agreement with the management making all of the decisions affecting the basic value of the enterprise and its chances of progressing toward its advertised goal. Because of this ongoing relationship and the fact that the entire $3,000,000 for Phase I was not col-

---

71. *Id.* at 891.

72. *See Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1049–1051 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Wright v. Heizer Corp.*, 560 F.2d 236, 250 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978).

73. *See, e. g., Goodman v. Poland*, 395 F.Supp. 660, 690–91 (D.Md.1975); *Rochez Bros., Inc. v. Rhoades*, 353 F.Supp. 795, 801–02 (W.D.Pa.), *aff'd as to liability,* 491 F.2d 402 (3d Cir. 1973).

lected "up front" but was to be contributed "from time-to-time" as Phase I progressed toward completion, the purchasers were left with the possibility of an investment decision each time a call was made. The purchasers, aware of their ability to bring about dissolution of the partnership if it could not be operated profitably, Ill.Rev. Stat. ch. 106½ § 32(1)(e), or, depending on the circumstances, to take other action, could hardly be said to have "signed on for the duration." Had the purchasers agreed to pay the entire three million dollars in one shot, perhaps they would have insisted upon a different type of agreement, providing more affirmative accountability by the General Partners, or would have taken a more active role in policing the disclosures of the General Partners. We cannot speculate as to possibilities. What we can state with some certainty, however, is that any "meeting-of-the-minds" which occurred when the Agreement was signed clearly involved a series of payments, and, potentially, a whole series of "investment decisions" which could be made based on the progress, or lack of progress, in Phase I development.[74] Whether the facts were such that any remedy to alter the plaintiffs' obligations[75] under the Agreement would have been available to them was, of course to be determined by the trier of fact in this action. If not, the undisclosed facts were not material, and failure to disclose them would not be actionable. But so long as an investment decision remained to be made upon any possible state of facts, the nondisclosure was in connection with the purchase of a security.

This is not the first time our court has recognized that the crucial fact in circumstances such as those at bar is whether an investment decision remains to be made by the party from whom disclosure is withheld,

and not upon when the agreement to purchase or sell was executed. Thus, the reverse side of the coin before us, *viz.*, that when the withheld information is obtained before that party makes an investment decision, damages resulting from that decision are not recoverable, was established in *Sundstrand*.[76]

In *Sundstrand,* the court determined the existence of 10b–5 liability and then turned to the question of damages. The purchaser, who was also the plaintiff in *Sundstrand,* had exercised an option to purchase roughly $6.7 million worth of stock by paying $334,-785 on January 9, with final delivery of the shares and payment of the remaining balance of $6,360,915 to take place between February 9 and April 19. Sometime before January 20, however, after the $334,785 payment but before the $6,360,915 payment, Sundstrand discovered material information (previously not disclosed by the other party) which made the purchases most undesirable. Notwithstanding this discovery, however, and on the advice of counsel that they were legally "committed" to follow through on the purchase, Sundstrand paid the outstanding balance on February 6. They then brought suit under § 10(b) to recover the entire $6.7 million.

The court, in limiting Sundstrand's recovery to the $334,785 originally paid did, in fact, utilize the *Radiation Dynamics* "commitment" date (January 9) to determine the cut-off date for damages. However, in rejecting Sundstrand's argument that they were "committed" to the entire payment on January 9, the panel made a significant distinction. It found that the advice of counsel had been incorrect, and that Sundstrand could have avoided the final payment—it determined that Sundstrand had had a *legal alternative which it could*

---

74. When all of these circumstances are combined with the fact that much of the money the General Partners collected from the purchasers was eventually paid to themselves (*i. e.,* companies owned by or associated with the General Partners), it becomes apparent that removing from the seller-defendants (General Partners) all obligation to inform the Limited Partners of material information *after* the date of the Lim-

ited Partnership Agreement would certainly not achieve the "goal of fundamental fairness in the securities marketplace."

75. *See* text at note 30, *supra.*

76. *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

*have exercised.* Based on this determination, the court refused recovery to Sundstrand of the larger amount.[77]

Similarly, in *Wright v. Heizer Corp.,* 560 F.2d 236, 250 (7th Cir. 1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978), we held that in circumstances where the materiality of an omission has been shown, proof of a legal alternative available to the plaintiff is sufficient to establish reliance. *Cf.* also *Daniel v. International Brotherhood of Teamsters,* 561 F.2d 1223, 1243 (7th Cir. 1977), *cert. granted,* 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978), (ability to vote down pension plan or withhold services from local fund found to be sufficient legal alternative to render contributions to "compulsory" pension fund a "purchase or sale").

We note that in an analogous context, the S.E.C.'s position on when a sale or purchase of a security occurs, (which is entitled to substantial weight, *Zeller v. Bogue Electric Manufacturing Co.,* 476 F.2d 795, 800 (2nd Cir. 1973)), is in accord with our holding. Rule 136(a) of the S.E.C.'s General Rules and Regulations under the Securities Act of 1933, 17 C.F.R. § 230.136 (1977), provides that a sale of a security occurs when the holder of assessable stock pays or agrees to pay "all or any part of such an assessment." Rule 136(c) provides that "assessable stock" is that which allows the issuer to repurchase the stock if the stockholder fails to meet the assessment call. The stockholder is, of course, "committed" to meet the assessment call; but his option to return the stock to the issuer in lieu of meeting the assessment requires an investment decision on his part, thereby bringing this situation within the reach of the Act. That Rule 136 is promulgated under the Securities Act, instead of the Securities Exchange Act, does not alter the conclusion. The Securities Act contains its own antifraud provision, § 17(a), 15 U.S.C. § 77q(a), which, similar to § 10(b) of the Securities Exchange Act, requires, *inter alia,* a sale or purchase of a security. To the extent the antifraud provisions differ, § 10(b) is generally considered to be broader in scope. *Ingenito v. Bermec Corp.,* 376 F.Supp. 1154, 1179 n.8 (S.D.N.Y.1974).

For all of the above-stated reasons, we find that, when an investment decision remained to be made at the time of a call for a capital contribution by a Limited Partner (see text at note 74, *supra*), the contribution by each Limited Partner in response to the call constituted a separate "purchase" of a security and, therefore, any material representations or omissions at that time were "in connection with the purchase or sale" of a security, as required by § 10(b) and Rule 10b–5.[78]

Given this conclusion, we must agree with the plaintiffs that the trial court's instruction to the effect that "each subsequent capital contribution . . . does *not* constitute a purchase of a security" (emphasis added) was an incorrect statement of the law which, under the circumstances of this case, amounted to a peremptory direction to the jury to find against the plaintiffs and in favor of defendants insofar as Count I was concerned. Such an incorrect direction was so obviously prejudicial to the interests of the plaintiffs that we must return this action to the district court for a new trial on Count I.[79]

---

77. 553 F.2d 1049–51.

78. Plaintiffs were also, therefore, "purchasers" of securities on each of these occasions as required by the "Birnbaum Rule," enunciated in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and recently approved in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

79. Defendants make what appears to be a collateral estoppel type of argument, asserting that, even if each contribution *were* considered a separate purchase, the jury, in deciding Counts II and III, must have already made a determination that none of the individual contributions was "wrongfully" induced through action that amounted to fraud (Count II) or breach of fiduciary duty (Count III). While it is, apparently, conceivable that the jury could have made the necessary determinations which would have precluded a retrial, a precise reading of the instructions shows that we can make no such assumption in this case.

A few words should be added about causation and damages. Capital contributions used to satisfy partnership liabilities which antedated actionable deception are of course not recoverable. If and to the extent that plaintiffs can establish that there became a time when, if they had been informed of the true state of affairs, they could have avoided throwing good money after bad, they will have proved a claim for which the securities laws affords them a remedy.

### Errors Alleged in the Conduct of the Trial

Because of our disposition of this case in section 4, *supra,* we need not go further here than to decide that the three alleged errors, even if they were errors, were insufficient, either individually or in combination, to warrant a new trial on all three Counts.[80] In fact, we here agree with defendants that, in a trial of such duration and complexity, it is remarkable that only three errors were alleged.

At a new trial, limited only to Count I, the trial court in its discretion, will have to determine the relevance of questions based on the circumstances as the court then perceives them. Thus, further direction at this point would be fruitless.

In summary, we hold that the instructions of the trial court were legally accurate insofar as they dealt with the validity of releases under federal securities laws, and the absence of any "due diligence" requirement on plaintiffs in a § 10(b)/Rule 10b–5 cause of action, and that the court's conduct of the trial was free of any errors sufficiently prejudicial to necessitate a new trial.

We further hold that the trial court's instructions on whether a Limited Partnership interest is a "security" under the federal securities laws, though they contained legal inaccuracies (which may be corrected in a new trial) did not constitute reversible error because plaintiffs failed properly to

The trial court's instructions on Count II were framed entirely by five elements, all involving "false representations" by the defendants. Thus, the jury could have found that defendants made no "false representations" and, on that basis alone, decided against the plaintiffs. Such a determination clearly would not decide the issue of whether defendants "omitted to state material facts," a prime aspect of a 10b–5 cause of action and one on which plaintiffs clearly relied in Count I. Also, the trial court's instructions on fraud obviously placed a "reasonable inquiry" or "due diligence" responsibility on plaintiffs which would not be present in a 10b–5 cause of action.

Similarly, the trial court's instructions on Count III (breach of fiduciary duty) indicated that the jury could decide for plaintiffs only if it found that the "partnership losses were sustained as a direct result of the defendants' fraud, bad faith, or willful disregard of a duty in conducting partnership affairs." Thus the jury could have found against plaintiffs because it believed the losses were incurred for other reasons. Clearly, this would not be determinative of the 10b–5 cause of action because it is not the *cause* of the losses which is significant but, rather, the *failure to inform* of those losses.

It is true, as pointed out in the petition for rehearing, that another passage in the instructions with respect to Count III tells the jury that, if the defendants failed to disclose material information relating to partnership affairs

and the plaintiffs were thereby injured, then the defendants were liable to the plaintiffs. For several reasons, however, we cannot infer from the verdict on Count III for defendants that the jury found there was no failure to disclose that caused injury to the plaintiffs. In the first place, the basis for the verdict on Count III may have been the release, which could have been effective as to Count III but not as to Count I because of the differing standards discussed earlier in this opinion. Moreover, apart from that possibility, the jury was not told that it was enough if an injury caused by other events could have been avoided by disclosure, nor, in view of what they had been told about when plaintiffs were committed, would they have understood how injury could have been avoided. Also, another instruction given shortly thereafter states that in order to find in favor of the plaintiffs on the breach of fiduciary responsibilities theory the jury would have to prove all of certain listed propositions, none of which had anything to do with failure to disclose.

*In sum, we do not think that the jury's verdict on Count III was necessarily based on a finding that there was no failure to disclose injuring plaintiffs.*

**80.** This, of course, means that the judgment on the jury verdict for Count II and for Count III will remain undisturbed and that the new trial will be limited to Count I, plaintiffs' federal securities law Count.

object to these instructions at trial and, therefore, failed adequately to preserve this question for appeal.

Finally, however, we hold that the trial court's instructions on the proper rule to employ in establishing the time of a "purchase" or "sale" of a security, which were both legally inaccurate and properly preserved for appeal, were so prejudicial to the interests of the plaintiffs with regard to Count I that we must mandate a new trial on that Count and that Count alone.

Accordingly, the judgment entered in the district court, against all plaintiffs and in favor of all defendants on all three Counts, is affirmed with regard to Count II and Count III and reversed with regard to Count I. Count I is hereby remanded to the district court for further proceedings not inconsistent with the above opinion. Each side will bear its own costs. The judgment of the district court is

AFFIRMED IN PART.

REVERSED IN PART AND REMANDED.