**John D. KEYS and Lewis E. Eastham, Plaintiffs,**

v.

**Dan M. WOLFE, Charles W. Maguire, Randy Moseley, Gene O'Neal, James D. Willeford, Bascom Lynn, Luther A. Henderson, Charles W. Tindall, Alden E. Wagner, Milton E. Loy, Gary M. Beach and Dean Bagley, Defendants.**

Civ. A. No. CA–3–81–1137–G.

United States District Court, N. D. Texas, Dallas Division.

April 29, 1982.

Werner A. Powers, M. Robert Blakeney, Seay, Gwinn, Crawford, Mebus & Blakeney, Dallas, Tex., for plaintiffs.

James V. Hammett, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Austin, Tex., Wm. E. Adams, San Saba, Tex., for Dean Bagley.

Coyt Randal Johnston, Dallas, Tex., for Luther Henderson, Chas. Tindall and Alden Wagner.

Blake Tartt, Tom Alan Cunningham, Houston, Tex., for Milton E. Loy and Dan Wolfe; Fulbright & Jaworski, Houston, Tex., of counsel.

Morris C. Gore, Baker, Miller, Phillips & Murray, Dallas, Tex., for Bascom Lynn.

Larry S. Parnass, Irving, Tex., for Gary Beach.

Roger L. Glandon, Abilene, Tex., for James D. Willeford.

MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

Wolfe Pecanlands, Inc. ("Wolfe") was formed in October 1971 for the purpose of planting, developing, and managing high density pecan orchards in Erath, Comanche and Eastland Counties, Texas. Wolfe planned to use new agricultural techniques to raise pecan trees to bearing size within five years from the date of planting rather than traditional techniques by which trees required ten years to reach maturity. As part of its plan, Wolfe acquired 6,000 acres of farm land. Through annual offerings or "programs" from 1972 to 1977, Wolfe sold units of land and contracted with investors to perform tree-growing and orchard management services. Plaintiffs invested in the 1973 program. The investment contract contained two phases. The first, or tree-growing phase, was for a term of five years during which plaintiffs paid an annual fee of $1,000 per acre, and Wolfe promised to plant and raise pecan trees to bearing size. During the second or management phase, a period of ten to twenty years, Wolfe agreed to manage the orchard at no cost to plaintiffs. Wolfe would recover its management costs from pecan orchard revenues and share 75% of any profit with the investor.[1]

During the five-year tree-growing phase, actual costs were greater in later years than earlier ones. By staggering sales of programs on an annual basis, Wolfe planned to generate cash flow through sales of newer orchards in order to cover costs generated by those in a later phase. Wolfe needed to keep selling programs long enough for the earlier programs to reach maturity, but the trees first planted did not

---

1. If pecan orchard revenues were inadequate to cover management costs in any given year, Wolfe was to carry the costs forward to the following year as a receivable to be satisfied from future pecan orchard revenues.

reach maturity on schedule so Wolfe had no revenues from the sale of pecans by 1979 when the investment contracts on the older programs had moved from the tree-growing to the management phase. As a consequence, the tree-growing fees paid by investors in the early programs ended while Wolfe incurred substantial management costs without pecan revenues.

Plaintiffs made their investment decision based on a 1973 prospectus. In the prospectus, Wolfe promised to install a drip irrigation system, but by late 1978, plaintiffs' land remained unirrigated. Defendant Maguire, president of Wolfe, encouraged all orchard owners in the 1973 program[2] to petition their land into a water district. The district was formed by Wolfe in 1976 to raise revenues by selling tax exempt bonds. In January 1979, Maguire promised in a memorandum to plaintiffs that Wolfe would indemnify plaintiffs for any taxes assessed by the water district and that, without expense to plaintiffs, the water district would irrigate their land. Plaintiffs petitioned the water district to add their land, but irrigation was never completed. Rather, plaintiffs irrigated the property themselves while the water district continued to assess and collect taxes.

Plaintiff seeks relief under sections 15 and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77o & 77q(a) and sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t, together with rule 10b–5, 17 C.F.R. § 240.10b–5 as well as Tex.Bus. & Com.Code Ann. §§ 17.46 and 27.01 (Vernon 1968), Tex.Rev.Civ.Stat. Ann. art. 581–33 (Vernon Supp. 1980–1981), and common law fraud. Specifically, plaintiffs claim that the 1973 prospectus contained these material misrepresentations:

1. that Wolfe was capable of irrigating the units of land sold through the prospectus;

2. that Wolfe had water rights sufficient to irrigate the property;

3. that tree-growing costs would be incurred on a fairly even basis through the tree-growing phase of the contract;

4. that Wolfe would realize a profit from tree-growing revenues;

5. that gross profits from the past program was $304,910, when it was substantially less;

6. that Wolfe had the expertise, manpower, and equipment to give the units of land proper attention during the tree-growing phase; and

7. that the success of the offering was independent from the success of other programs.

The plaintiffs further allege that the 1973 prospectus omitted these material facts:

1. Wolfe's inability to maintain sufficient equipment and personnel necessary to give each of its programs and each of the tracts in any program the same management attention;

2. the substantial risk that irrigation could not be accomplished;

3. the planned use of proceeds obtained through the offering;

4. the participation by insiders in an earlier program;

5. the conflicts of interest that could arise as a result of insider participation in an earlier program;

6. that the success of the orchards depended upon future offerings or sales of other programs;

7. that conflicts could arise between the 1973 program and other programs since Wolfe would begin earning management fees from successful programs regardless of the success of the 1973 program, thereby giving Wolfe a motive to devote more time and materials to more profitable programs than the 1973 program; and

8. that orchards of inside investors would receive more care and attention from Wolfe than would those belonging to outside investors.

In addition, plaintiffs claim that the 1979 memorandum encouraging their participa-

---

**2.** By 1978, substantially all of the orchard property was within the water district except the property sold in the 1973 program.

tion in the water district omitted these material facts:

1. that there was a substantial risk that Wolfe would not be able to pay taxes assessed by the water district;

2. that the ability of the water district to provide irrigation was entirely dependent on the continued viability of Wolfe;

3. that officers, directors and other insiders of Wolfe owning orchards in the water district stood to gain by plaintiffs' adding their land;

4. that the water district was Wolfe's alter ego; and

5. that there was a substantial likelihood that the water district lacked sufficient water rights and funds to irrigate the orchards.

Defendants Wolfe, Henderson, Tindall, Wagner, Maguire, Moseley, O'Neal, Lynn and Willeford have moved to dismiss plaintiffs' complaints on these common grounds: [3]

1. section 17(a) of the Securities Act of 1933 does not give rise to an implied private cause of action;

2. section 15 of the Securities Act of 1933 does not impose liability upon control persons pursuant to a claim under section 17(a);

3. no control person liability can be established without joining Wolfe Pecanlands, Inc. against whom involuntary bankruptcy proceedings have been instigated;

4. plaintiffs' petitioning to have their land annexed by the water district is not an act concerning a purchase or sale of a security;

5. any claim based on the 1973 prospectus is barred by the statute of limitations; and

6. plaintiffs have not sufficiently alleged scienter as required by section 10(b), fraud as required by Fed.Rule Civ.Proc. 9(b), and the facts of a conspiracy.

## I. The Claims Pursuant to Section 17(a) of the Securities Act

### A. Implied Right of Action Under Section 17(a)

■ Plaintiffs claim a violation of section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q, by Wolfe and defendant Maguire, president of Wolfe.[4] That section provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

The statute is silent regarding its enforcement by a citizen's suit. Some lower courts, relying primarily on Judge Friendly's concurring opinion in *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 867–68 (2d Cir. 1968), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), have found an implied right of action under section 17(a).[5] Judge Friendly concluded: "Once it

---

**3.** Defendants Lynn and Willeford have also moved for summary judgment. *See* Part VI *infra.*

**4.** Maguire's alleged liability is based on his 1973 memorandum to the plaintiffs. Plaintiffs allege liability on the part of Wolfe as a "controlled person" in order to assert liability on the

part of defendants as "control persons." *See* Part IB *infra.*

**5.** *See, e.g., Kirschner v. United States*, 603 F.2d 234, 241 (2d Cir. 1978), *cert. denied*, 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979); *Daniel v. International Bd. of Teamsters*, 561 F.2d 1223, 1245 (7th Cir. 1977), *rev'd on other grounds*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d

has been established ... that an aggrieved buyer has a private action under [section] 10(b) of the 1934 Act, there seem[s] little practical point in denying the existence of such an action under [section] 17." *Id.* at 867.

The Supreme Court has expressly reserved deciding the issue, *see Blue Chip Stamps v. Manor Drug Store*, 421 U.S. 723, 752 n.15, 95 S.Ct. 1917, 1933 n.15, 44 L.Ed.2d 539 (1975), but in two recent decisions, it has shown a reluctance to infer a private right of action under other statutes. In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court refused to find a private right of action under section 17(a) of the Securities Exchange Act of 1934, pointing to the absence of legislative history that Congress so intended. The Court noted that of the four factors outlined in *Cort v. Ash*, 442 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), relevant to finding an implied right of action, those focusing on legislative intent are critical.[6] The Court both cited the hazard of "[i]mplying a private right of action on the basis of congressional silence," 442 U.S. at 571, 99 S.Ct. at 2486, and stressed that other sections of the Act expressly provided for private damage actions.

> Further justification for our decision not to imply the private remedy ... may be found in the statutory scheme of which 17(a) is a part.... Section 17(a) is flanked with the provisions of the 1934 act that explicitly grant private causes of action.... Obviously, then, when Congress wished to provide a damage remedy, it knew how to do so and do so expressly.

*Id.* at 572, 99 S.Ct. at 2487. In emphasizing its turn in analytical focus from judicially perceived need and legislative symmetry to congressional intent, the Court retreated from its holding in *J. I. Case Co. v. Borak*,

377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964):

> In *Borak*, the Court found in § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), an implied cause of action for damages in favor of shareholders for losses resulting from deceptive proxy solicitations of § 14(a).... To the extent our analysis in today's decision differs from that of the Court in *Borak*, it suffices to say that in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today [citation omitted]. The ultimate question is one of congressional intent, not whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law.

*Id.* at 576–78, 99 S.Ct. at 2489–2490.

By the same analysis, the Court was unable to find that Congress intended a private cause of action for violations of section 206 of the Investment Adviser's Act of 1940, 15 U.S.C. § 80b–6. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Section 206 of the 1940 Act is an anti-fraud provision similar to section 17(a). The *Transamerica* Court reasoned that:

> Congress expressly provided both judicial and administrative means for enforcing compliance with Section 206.... In view of these express provisions for enforcing the duties imposed by Section 206, it is highly improbable that Congress absentmindedly forgot to mention an intended private action.

444 U.S. at 16, 100 S.Ct. at 247. As the Securities Act of 1933 has "express provisions for enforcing" the Act in sections 11 and 12, the Supreme Court's refusal to infer private rights in these preceding cases suggests it would adopt the same posture with regard to section 17(a).

---

808 (1979); *Newman v. Prior*, 518 F.2d 97 (4th Cir. 1975).

**6.** Of the factors that the Court in *Cort v. Ash*, 442 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) directed be considered: (1) the language and focus of the statute, (2) its legislative history, (3) its purpose and (4) the action's relegation to

state law, the *Touche Ross* Court emphasized that the first three are "traditionally relied upon in determining legislative intent." 442 U.S. at 576, 99 S.Ct. at 2489. For a comprehensive discussion of the *Touche Ross* decision and its effect, see Comment, *The Federal Securities Acts: The Demise of the Implied Private Rights Doctrine*, 1980 U.Ill.L.F. 627.

The fifth circuit has not decided whether an implied right of action exists under section 17(a). The court noted in *Herpich v. Wallace*, 430 F.2d 792, 799, that the issue need not be decided when plaintiff has a legitimate section 10b–5 claim. *Id.* at 799 n.6. In *Pharo v. Smith*, 621 F.2d 656 (5th Cir. 1980), the court again avoided deciding the question but commented: "It has been observed that Congress, in explicitly providing a well-conceived scheme of liability in the Securities Act, indicated there was no legislative intent to imply a section 17(a) private damage action, *see* 3 L. Loss, *Securities Regulation* 1784–90 (1966)." *Id.* at 661.[7]

Several district courts in the fifth circuit have decided no implied right exists. *See Hibbard, O'Connor & Weeks v. Osbourne*, No. 80–1119 (S.D.Tex. October 28, 1980); *Martin v. Howard, Weil, Labouisse, Friedricks, Inc.*, 487 F.Supp. 503 (E.D.La.1980); *Gunter v. Hutcheson*, 433 F.Supp. 42 (N.D. Ga.1979). The court in *Gunter* stressed,

> The only provision in either the 1933 or 1934 Act that can be read to impose liability for damages for negligent misrepresentation without restrictions as to the kinds of plaintiffs, due diligence defenses, or a short statute of limitations is § 17(a)(2) of the 1933 Act. [citations omitted]. However, to permit such a cause of action would undermine the carefully framed limitations imposed by Congress in §§ 11 and 12 of the 1933 Act and 10(b) of the 1934 Act. . . .

433 F.Supp. at 45.

One commentator has stressed that the Supreme Court decision in *Aaron v. S.E.C.*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), requiring that the SEC show only negligence under sections 17(a)(2) and 17(a)(3) gives an additional reason for denying an implied private right. Not to do so would allow a plaintiff to show only negligence under 17(a)(2) and (3) when the parallel statute, section 10(b), requires scienter.

Note, *Implication Under Section 17(a) of the Securities Act of 1933—The Effect of Aaron v. SEC*, 49 Fordham L.Rev. 1161 (1981). Requiring proof of scienter under section 10(b) but not under 17(a)(2), albeit in an SEC enforcement action, undercuts Judge Friendly's reasoning in *Texas Gulf Sulphur* that once a right under section 10(b) is established, no practical reason exists to deny the right under section 17(a); but Judge Friendly's suggestion is no longer well-taken for a more basic reason. "Practicality" is relevant after *Touche Ross* only to a search for congressional intent. That is, the question is not what a court believes ought to be (practical); rather, the question is what Congress intended to be.

Applying the analysis of *Touche Ross* and *Transamerica Mortgage Advisors*, this court is unable to find that Congress intended that section 17(a) provide a private right of action. Such intent cannot be found in the language of the statute nor its congressional history. Congress was well aware of private actions when it enacted the Securities Act of 1933, having created specific and self-contained rights of action in sections 11 and 12. Directly stated, if Congress had intended in section 17(a) to create a private right of action, it would have said so.

### B. Control Person Liability

■ Plaintiffs also claim that defendants are controlling persons within the meaning of section 15 of the Securities Act, 15 U.S.C. § 77*o* (1971). Their argument is that as officers, directors, and shareholders of Wolfe, the defendants should be jointly and severally liable for a violation of section 17(a) by Wolfe. Having found no private right of action under section 17(a), there is no liability for its violation to be attributed to defendants by virtue of their control status, or otherwise. Regardless, section 15, by its own language, does not impose liability upon control persons for claims un-

---

7. The court in *Huddleston v. Herman & Maclean*, 640 F.2d 534 (5th Cir. 1981), *cert. granted*, - U.S. - -, 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982) did not "create a new remedy" but decided that an "established remedy may be invoked despite the existence of another remedy for the same conduct." *Id.* at 542. That is, "a cause of action lies under Section 10(b) of the 1934 Act and Rule 10b–5 even if the deceit that is the basis for the Section 10(b) action may also be actionable under other express liability provisions of the securities laws." *Id.* at 543.

der section 17. Under section 15, control persons may be jointly and severally liable with "any person liable under Section [11] or [12] of this title." There is no provision for a control person to be jointly and severally liable for a violation of section 17. *See S.E.C. v. Savoy Industries,* 587 F.2d 1149, 1170 n.41 (D.C.Cir.1978).

## II. The Necessity of Wolfe's Joinder

 Plaintiffs also claim that liability may be attributed to defendants as control persons pursuant to section 20 of the 1934 Act, 15 U.S.C. § 78t for a violation of section 10(b), 15 U.S.C. § 78j.[8] Section 20 provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Defendants counter that section 20 requires Wolfe's joinder because defendants can only be jointly and severally liable "with and to the same extent as [Wolfe] to any person to whom [Wolfe] is liable...." As Wolfe is involved in bankruptcy proceedings, its joinder is not feasible, so the court must decide whether, despite the absence of Wolfe, the liability of the defendants may be determined. The defendants rely on *Turner v. First Wisconsin Mortgage Trust,* 454 F.Supp. 899 (E.D.Wisc.1978) and *Jenkins v. Fidelity Bank,* 365 F.Supp. 1391 (E.D.Pa.1973).[9] Although the language in those cases is equivocal, in neither case did the court decide that plaintiffs failed to state a claim because a controlled person was not joined. Each bases its conclusion on the fact that the plaintiffs made no charge in the complaints that the defend-ants controlled a person who had violated the securities laws. In *Turner,* the plaintiff claimed a violation of section 12(2) of the 1933 Act by defendants from whom no purchase of securities was made. Plaintiff did not allege that defendants were control persons. The court noted: "[W]hile § 15 provides for secondary liability on the part of persons in a control relationship to the seller, § 15 does not create a direct cause of action against such persons.... [T]he 'privity' required between seller and buyer under § 12(2) has undergone a gradual expansion, ... [but] it has not expanded so far as to include the defendants. Turner did not purchase her shares ... directly from any of those defendants ... nor has she claimed they 'controlled' her immediate seller as required under § 15...." 454 F.Supp. at 912–13. In *Jenkins* the plaintiff alleged that defendants were liable for violations of sections 11(a) and 15 of the 1933 Act. The court followed its statement that "[t]he availability of [section 15] turns upon the presence, inter alia, of liability of a controlled person under Section 11 or 12" with the observation that "[n]owhere ... has the plaintiff charged any person with a violation of the registration statement requirements [of section 11(a)]. The failure to show liability of a controlled person under the registration statement section requires that the complaint against the individual directors be dismissed." 365 F.Supp. at 1402. Each court required the complaint to specifically allege the liability of a controlled person; neither required joinder of that person.

In *First National Bank of Las Vegas, New Mexico v. Estate of Russell,* 657 F.2d 668 (5th Cir. 1981), the plaintiff sued various control persons of a bankrupt brokerage firm, seeking to recover for losses it sustained as a result of a repurchase transaction it entered into with the brokerage firm. Without discussing whether the bro-

---

**8.** Plaintiffs charge defendant Maguire with a direct violation of section 10(b) and all defendants with liability as control persons of Wolfe Pecanlands, Inc.

**9.** The claims in these cases were based on section 15 of the 1933 Act, but the fifth circuit concluded in *Pharo v. Smith,* 621 F.2d 656, 673–74, that section 15 and section 20 of the 1934 Act are analogous and should be interpreted similarly.

kerage firm was an indispensable party, the fifth circuit determined that the plaintiff stated a claim against the control persons. A more direct suggestion of the fifth circuit view is found in *Paul F. Newton & Co. v. Texas Commerce*, 630 F.2d 1111 (5th Cir. 1980). Plaintiff Newton initiated an action against the brokerage firm of Pressman, Frohlich and Frost (Pressman), its employee Bader, several other brokerage firms and individuals allegedly involved in a conspiracy to inflate the price of stock. Pressman was named as a "control person" of its employee Bader. When the suit went to trial, Pressman was the only defendant who had not defaulted, settled, or been dismissed. Reviewing the district court's finding that Pressman had satisfied the requisites for a good faith defense, the fifth circuit stated: "To warrant a finding of liability under § 20(a) a plaintiff must show that the defendant controls a person upon whom liability *could be imposed* for a violation of the Securities Exchange Act." 630 F.2d at 1119 (emphasis added). Recognizing that the district court did not expressly decide "[w]hether Bader had committed a violation of the Securities Exchange Act for

which he might be liable," *id.* at 1120, the court noted that there was sufficient evidence to establish Pressman's control over Bader and Bader's involvement in a conspiracy to manipulate the price of stock. Nothing in the language of section 20(a) compels the presence of the controlled person whose misdeeds are sought to be attributed to the defendants charged to be controlling persons, and nothing in familiar and conceptually related attribution principles such as conspiracy membership, agency, or aider and abettor, demands a visiting of actual liability upon an active wrongdoer as a condition to an attribution of that liability.

I conclude then that plaintiffs here must establish defendants' control over Wolfe[10] and to present sufficient evidence that Wolfe violated the Securities Exchange Act, but need not join Wolfe as a party.[11]

### III. Purchase or Sale of a Security

▮▮▮▮ Plaintiffs, claiming that the 1979 memorandum written by defendant Maguire contained material misrepresentations and omissions of fact, argue that the deception was "in connection with a purchase or

10. Defendants Bagley and O'Neal were not directors or officers when the 1973 prospectus was offered to plaintiffs. The allegation that they were key employees in 1973 is insufficient to maintain control person liability with regard to that prospectus, so claims regarding the 1973 prospectus and their control status are dismissed against these two defendants.

11. *See also Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971), in which the court rejected the defendants' argument that they could not be held liable as control persons when the liability of the agricultural cooperative that they controlled had not been established.

> [T]he [cooperative] was dismissed from the suit for lack of jurisdiction due to a failure to obtain service of process. It further appears that the reason for the failure to obtain process was that the Association had been dissolved on the initiative of many of the individual defendants in the present suit. On such facts it is evident that [section 20(a) ] is of no avail to defendants.

One commentator, discussing section 15 of the 1933 Act, suggests that by analogy to the common law decisions on joint and several liability of master and servant, a control person should be liable for the controlled person's wrong. A

master answers vicariously for a servant's wrong, not for his adjudicated liability.

> Absent legislative history resolving or even considering this issue, the remedial purpose of the statute dictates a broad construction which would not excuse control persons from ... liability for the proven wrongs of a controlled person even if the latter is not himself legally liable. Such a construction, even if arguably contravening literal statutory language, conforms to established canons of construing regulatory legislation.... In *United States v. American Trucking Ass'ns*, 310 U.S. 534 [60 S.Ct. 1059, 84 L.Ed. 1345] (1940), the Supreme Court refused, in construing a statute, to "take a few words from their context and with them thus isolated to attempt to determine their meaning," *id.* at 542 [60 S.Ct. at 1063], and followed the rule that "even when the plain meaning" of statutory terms produces "merely an unreasonable" result which is " 'plainly at variance with the policy of the legislation as a whole,' this court has followed that purpose, rather than the literal words." *Id.* at 543 [60 S.Ct. at 1063].

Folk, *Civil Liabilities Under the Federal Securities Acts, The Bar Chris Case*, 55 Va.L.Rev. 99, 217–18 & n.64 (1969).

sale" within the meaning of the 1934 Act. They contend that by agreeing to have their property annexed to the water district, they substantially modified their investment contract, a transaction within the scope of the securities law. Defendants disagree.

Courts generally acknowledge that the federal security acts grant no right of action for fraud allegedly committed to induce the retention of a security, *see, e.g., Halperin v. Edwards & Hanley*, 430 F.Supp. 121 (E.D.N.Y.1977); *see also* Note, *The "In Connection With" Requirement and Pretrial Dismissals of Rule 10b–5 Private Claims for Damages*, 56 Texas L.Rev. 62, 94 (1977). Some courts have recognized, however, that either a subsequent investment decision involving an investment contract or a substantial modification of an investment contract constitutes a purchase or sale of a security. In *Goodman v. Epstein*, 582 F.2d 388 (7th Cir. 1978), the plaintiffs, limited partners, sought damages from the general partners as a result of a failure of a land development scheme. Plaintiffs argued that each capital contribution made after, but pursuant to, the partnership agreement was a "purchase." The court agreed:

This was not a "one-shot deal." The parties clearly envisioned an ongoing relationship under the Agreement with the management making all of the decisions affecting the basic value of the enterprise and its chances of progressing toward its advertised goal. Because of this ongoing relationship and the fact that the entire $3,000,000 for Phase I was not collected "up front" but was to be contributed "from time-to-time" as Phase I progressed toward completion, the purchasers were left with the possibility of an investment decision each time a call was made.... [A]ny "meeting-of-the-minds" which occurred when the agreement was signed clearly involved a series of payments, and, potentially, a whole series of "investment decisions" which could be based on the progress, or lack of progress, in Phase I development.... [S]o long as an investment decision remained to be made upon any possible

state of facts, the nondisclosure was in connection with the purchase of a security.

*Id.* at 412–13.

In *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154 (S.D.N.Y.1974), the plaintiffs invested in cattle and entered into maintenance agreements whereby Black Watch Farms, Inc. provided complete care for the animals. Black Watch defaulted on the maintenance agreements. Among other claims, plaintiffs alleged that Black Watch conspired to mislead them by lulling them into retaining their investments by means of various modifications of the underlying investment contracts. One such modification was an exchange of the original maintenance contract for one providing for reduced monthly charges. The court decided that this exchange of contracts constituted a sale of a security for purposes of section 10(b).

The maintenance contracts ... were pivotal to the herdowner's investment "package," and required on-going payments over a period of time. The herdowner exchanging his contracts was indeed making an investment choice: whether to sell his herd immediately or to commit himself to further substantial payments to increase his equity.... Without attempting to define the precise contours of a § 10(b) event, we find that threshold § 10(b) jurisdiction is established where, as here, there is alleged a substantial modification of an investment contract creating fresh rights and obligations of the parties, and the investor gives some consideration, either a promise of future payments or the relinquishment of a significant right.

*Id.* at 1181–82.

Both *Goodman* and *Ingenito* are distinguishable from the facts of this case. By agreeing to petition to annex their land to the water district, plaintiffs made no "investment" decision because they made no investment. The right to irrigation, not a "fresh right" but one established by the original investment contract, was to be satisfied at no cost to plaintiffs. They gave no

additional consideration.[12] Their final payments of $1,000 per acre were made before the annexation in December, 1978 and January, 1979 as required by the maintenance contracts. In contrast, the plaintiffs in *Goodman* and *Ingenito* bound themselves to further substantial payments by their investment decisions. The "investment decision" to rely on the water district rather than Wolfe Pecanlands, Inc. for irrigation is not such a "substantial modification" of an investment contract that it becomes a purchase or sale of a security. Viewed most favorably to plaintiffs, there was no more than an inducement to retain an earlier purchased security. The line is not always bright between continued participation in a business relationship, the initial entry into which constituted a purchase of a security and later financial outlays that represent independent purchases of securities. Yet, it must be drawn because not making the distinction would draw traditional breaches of contract under the securities acts. The fifth circuit has wisely been chary of efforts further to expand the definition of purchase or sale. *See Broad v. Rockwell Intern. Corp.*, 614 F.2d 418, 437 (5th Cir. 1980), *on rehearing* 642 F.2d 929 (1981).[13] It follows that the fraud allegedly caused by the 1979 memorandum was not "in connection with the purchase or sale of a security," and this claim regarding section 10(b) grounded on the 1979 memorandum must be dismissed.[14]

### IV. The Statute of Limitations

■ Defendants contend that plaintiffs' claims based on the alleged fraud in the 1973 prospectus are barred by the statute of limitations because the complaint was not filed until November 13, 1981. Plaintiffs argue that the claims are not barred because the limitation period does not begin to run until the misrepresentation is discovered, *see Sargent v. Genesco, Inc.*, 492 F.2d 750, 758 (5th Cir. 1974), and that plaintiffs did not discover the fraud until 1980. Because a question exists as to when plaintiffs discovered the fraud, resolving the statute of limitations issue on a motion to dismiss would be inappropriate. *In re Caesar's Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973).

■ As the federal securities laws contain no statute of limitations which is expressly applicable to private actions under section 10(b) and rule 10b–5, a federal court must adopt the limitations period that the forum state applies to the state cause of action bearing the closest substantive resemblance to the implied cause of action arising under the federal provisions. *McNeal v. Paine, Webber, Jackson & Curtis, Inc.*, 598 F.2d 888 (5th Cir. 1979). The parties do not take a definite position concerning which statute is applicable. The fifth circuit in *Wood v. Combustion Engineering, Inc.*, 643 F.2d 339 (5th Cir. 1981), decided that the two year Texas general fraud statute, Tex.Bus. & Com.Code § 27.01 (Vernon 1968), rather than the three year statute governing actions under the old blue sky law, Tex.Rev.Civ.Stat.Ann. art. 581–33 (Vernon 1964), applied to actions under section 10(b). The *Wood* decision did not consider the 1977 amendments to article 581–33 that "substantially revised and modernized section 33 of the Texas Securities

---

**12.** The tax payments plaintiffs have made since Wolfe's bankruptcy were not contemplated at the time of the annexation.

Plaintiffs argue that they contributed capital in the form of taxable interest in their property. Given the fifth circuit's interpretation of the purchase or sale requirement, *see* note 13 *infra* and accompanying text, that allegation is not sufficient to place plaintiffs' transaction under the umbrella of the securities laws.

**13.** In *Broad*, a panel of the fifth circuit decided that a supplemental indenture did not so substantially change the underlying security as to fall within the forced or constructive sale doctrine. Rather, the supplemental indenture was a contractual modification of an ongoing agreement, not a sale. On rehearing, the court *en banc* decided the case without reaching the issue of whether a sale occurred, but the panel's observation that the court is reluctant to expand the definition of "purchase" or "sale" continues to be a valid one.

**14.** The state law claims against all defendants with regard to the 1979 memorandum remain viable if plaintiffs can show a conspiracy, *see* part V.C. *infra*, or joint and several liability.

Act to provide all securities litigants in Texas with a substantially more comprehensive and better balanced set of statutory litigation rights and remedies." Bateman, *Securities Litigation: The 1977 Modernization of Section 33 of the Texas Securities Act,* 15 Houston L.Rev. 839 (1978). This court must consider whether these post-*Wood* amendments to the blue sky laws may require a different decision regarding the application of the two-year statute of limitations for the Texas general fraud statute to actions under section 10(b) of the 1934 Securities Exchange Act. The fifth circuit based its conclusion in *Wood* on two "major considerations": that the general fraud statute requires proof of reliance and proof of scienter whereas the blue sky laws did not require either. As "additional factors," the court noted that the old blue sky laws did not provide a due diligence defense or a cause of action for a defrauded seller, and thus the general fraud statute was substantially more analogous to section 10(b). The due diligence defense and the cause of action for the defrauded seller are now available by virtue of the 1977 amendments. Nonetheless, as these were not "major considerations" like the scienter and reliance issues which have not been affected by the 1977 amendments, the *Wood* precedent must be obeyed. The two-year general fraud statute still applies to actions under section 10(b).[15]

### V. Sufficiency of Pleadings

Defendants attack the sufficiency of plaintiffs' pleadings in three respects: (1) failure to plead fraud with particularity as required by Fed.R.Civ.Proc. 9(b), (2) failure to allege scienter under section 10(b), and (3) failure to allege specific facts regarding the claimed conspiracy.

### A. Rule 9(b) Requirements

 Rule 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Cognizant that the requirements of rule 9 must be reconciled with rule 8 that requires a short and plain statement of a plaintiff's claims, *see* Wright & Miller, *Federal Practice and Procedure* § 1298 (1969), courts have decided that conclusory allegations of fraud are insufficient but that detailed evidence is not required. *See, e.g., In re National Student Marketing Litigation,* 413 F.Supp. 1156 (D.D.C.1976). Wright and Miller state that the particularity required by rule 9 refers to the "time, place and contents of the false representations as well as the identity of the person making the misrepresentation and what he obtained thereby." C. Wright & A. Miller, *Federal Practice and Procedure* § 1297 at 403 (1969). In this case, plaintiffs allege that in the 1973 prospectus Wolfe made seven specific misrepresentations and eight specific omissions, *see* Plaintiffs' First Amended Complaint at 12–14; *see also* page 1057 *supra,* and that plaintiffs relied on these misrepresentations and omissions when investing in the land sales contracts and the orchard management contracts. Because of this reliance, plaintiff Keys paid $74,393.50 for 94.41 acres of land, and plaintiff Eastham paid $35,182.00 for 42 acres of land. Both agreed to pay $1,000 per acre each year for maintenance. Thus, defendants know the time, place, contents and source of the alleged misrepresentations.

 Defendants rely on *Helfant v. Louisiana & Southern Life Ins. Co.,* 459 F.Supp. 720 (E.D.N.Y.1978), for the proposition that "plaintiff must with sufficient particularity identify the misrepresentations allegedly made, the manner in which they are considered false, and the facts from which an inference of fraud by a *given* defendant

---

**15.** The statute of limitations for the Texas blue sky laws now provides:

No person may sue under section 33A(a) [the antifraud section] . . .

(a) more than three years after discovery of the untruth or omission or after discovery should have been made by the exercise of reasonable diligence; or
(b) more than five years after the sale. . . .

may be drawn." *Id.* at 726 (emphasis in original). Though plaintiffs' complaint explains each misrepresentation and its falsity without explaining each individual's defendant's fraudulent acts, the latter requirement does not apply when the alleged liability is as a control person of an entity that violated the securities laws. *See In re National Student Marketing Litigation*, 413 F.Supp. 1156, 1158 (D.D.C.1976) (allegations relating to control group not covered by rule 9(b)'s particularity requirement because they concern vicarious liability for fraudulent activity and are not "averments of fraud").

■ Plaintiffs' complaint is sufficient (1) to ensure that the allegations are specific enough to inform defendants of the acts complained of so they can prepare an effective response and defense, (2) to avoid the charge of claiming an "unknown wrong," and (3) to avoid a charge of being an unfounded claim of wrongdoing. *See In re Com. Oil/Tesoro Petroleum Corp.*, Sec.Lit., 467 F.Supp. 227, 250 (W.D.Tex.1979). Thus, the complaint is sufficient to survive a motion to dismiss.

### B. The Scienter Requirement

■ The Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), established that in a section 10(b) action, plaintiffs must allege an intent to deceive, manipulate or defraud. The Court reserved the issue of "whether, under some circumstances, scienter may also include reckless behavior," *Aaron v. S.E.C.*, 446 U.S. 680, 686 n.5, 100 S.Ct. 1945, 1950 n.5, 64 L.Ed.2d 611 (1980), but the fifth circuit has decided that proof of severe recklessness satisfies the scienter requirement. *See Broad v. Rockwell International Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981). Rule 9(b) provides that "malice, intent, knowledge and other condition of mind of a person may be averred generally." In paragraph 118 of the complaint, plaintiffs allege that "the false misrepresentations communicated by Wolfe through the Prospectus were made with the knowl-

edge of their falsity or with reckless disregard for the truth. . . ." *See* Plaintiffs' First Amended Complaint at 17. That general allegation of state of mind is sufficient to meet the standards of *Ernst & Ernst* and *Broad. See Cramer v. General Tel. & Electronics Corp.*, 582 F.2d 259, 273 (5th Cir. 1978). Allegations that each individual defendant acted with intent to deceive or severe recklessness are unnecessary in a claim against control persons under section 20(a) of the 1934 Act, 15 U.S.C. § 78t. *See In re National Student Marketing Litigation*, 413 F.Supp. 1156, 1158 (D.D.C.1976). In paragraphs 64–68 of the complaint, plaintiffs sufficiently allege that defendants Wolfe, Willeford, Tindall, Henderson, Wagner and Loy were in control of Wolfe at the time the 1973 prospectus was drafted. That allegation is sufficient. These defendants have a good faith defense under section 20 if, in fact, they did not directly or indirectly induce plaintiffs' purchases through the 1973 prospectus. *See Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 824 (E.D.Wisc.1977).

### C. The Conspiracy Allegation

■ Plaintiffs allege that the defendants Wolfe, Henderson, Tindall, Willeford, Wagner, Loy, Bagley and O'Neal "participated in the formulation of the 1973 prospectus or acquiesced in the misrepresentations contained therein, all as part of a conspiracy to defraud investors." They further allege that "defendants Wolfe, Henderson, Tindall, Wagner, Loy, Beach, O'Neal, Bagley, Lynn, Maguire, and Moseley knew of the plan to include the 1973 program in the Water District, were in a position to exercise control over Wolfe, and participated in the decision to disseminate the [1979] Memorandum or acquiesced in making the misrepresentations contained therein, all as part of a conspiracy to defraud investors in the 1973 Program." *See* Plaintiffs' First Amended Complaint at 10–11. These statements are more than conclusory allegations of conspiracy, *see Cairo*

v. *Skow*, 510 F.Supp. 201 (E.D.Wisc.1981),[16] and enable the defendants to prepare an adequate responsive pleading. ·See 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1233, at 181.

### VI. The Summary Judgment Motions

The court denies defendants Lynn and Willeford's motions for summary judgment based on their lack of participation in the fraud or conspiracy because, based on the affidavits of the plaintiffs and defendants, a genuine issue of material fact exists with regard to their participation. *See* Fed. R.Civ.Proc. 56(c).

### VII. Conclusion

In sum, the court decides that (1) no implied private right of action exists under section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a); (2) section 15 of the 1933 Act, 15 U.S.C. § 77o, does not impose liability upon control persons pursuant to a claim under section 17(a); (3) the liability of defendants as control persons can be established without joining the "controlled person," Wolfe Pecanlands, Inc.; (4) petitioning to have plaintiffs' land annexed by the water district is not an act concerning the purchase or sale of a security, and the claims against defendants based on a violation of the securities laws through the 1979 memorandum must be dismissed; (5) the statute of limitations issue will not be resolved on a motion to dismiss; (6) plaintiffs' pleadings regarding fraud, scienter and conspiracy are sufficient; and (7) defendants Lynn and Willeford's motions for summary judgment are denied.

---

**16.** In *Cairo* the court decided the following allegation was conclusory because it contained no factual allegation:

That at all times relevant hereto, all of the defendants acted together, conspired and acted in concert by common agreement and design to willfully and intentionally deprive the plaintiff of his constitutional rights. 510 F.Supp. at 206.